NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190671-U

NO. 4-19-0671

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 27, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| FRANCISCO AVILA CORTES, | ) | No. 17CF1385 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's claim of ineffective assistance is unpersuasive because (1) some of the evidentiary objections that he argues his defense counsel should have made would have been unmeritorious and (2) the exclusion of other evidence of which the defendant complains would have yielded no reasonable probability of a different outcome.

¶ 2    In May 2019, in the circuit court of McLean County, a jury found the defendant, Francisco Avila Cortes, guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), two counts of domestic battery (*id.* § 12-3.2(a)(2)), one count of child endangerment (*id.* § 12C-5(a)(1)), and one count of resisting a peace officer (*id.* § 31-1(a)). The court sentenced him only for the two counts of criminal sexual assault: four years' imprisonment for count I and a consecutive term of four years' imprisonment for count V.

¶ 3    Cortes appeals, claiming that his defense counsel rendered ineffective assistance. Specifically, Cortes maintains that he was denied a fair trial when defense counsel failed to do the

following: (1) move for the redaction of irrelevant and prejudicial portions of an arrest video; (2) object to inadmissible character evidence; and (3) object to testimony by T.S. that Cortes forced her mother, Lucila Garcia, to have sex with him. For reasons we will explain, not all of this evidence of which Cortes complains was inadmissible—and to the extent that the evidence was inadmissible, excluding it would have yielded no reasonable probability of an acquittal.

¶ 4        Therefore, we affirm the judgment.

¶ 5                I. BACKGROUND

¶ 6          A. Garcia's Account of What Happened on December 24, 2017

¶ 7        Garcia testified that around April 2016, she and Cortes began a romantic relationship even though (as Garcia at some point realized) Cortes was married to Oyuki Contreras. Garcia and Cortes had a daughter together, two-year-old I.A.-J., who resided with Garcia. Cortes stopped by Garcia's residence once a week, had sex with her, gave her money, and sometimes brought a gift for I.A.-J. On occasion, when Contreras was away, Garcia went to Cortes's residence and had sex with him there.

¶ 8        On December 24, 2017, around 10 p.m., Cortes arrived at Garcia's residence. He was drunk. He had no gift for I.A.-J., but he brought Garcia some money. He asked Garcia what she had made for Christmas dinner. She answered that because she intended to go out and spend Christmas Eve with a friend, she had prepared no food. Cortes told Garcia that she lacked his permission to go anywhere. He was like that, Garcia claimed: he prohibited her from doing things "all the time," and if she failed to follow his instructions, they would get into a "fight," in which he would insult her and sometimes threaten her. For instance, he had warned her that if he found out she was "with someone else," he would burn down her trailer or hit her with a car so that she would be unable to walk.

- 2 -

¶ 9        In short, Garcia, in her testimony, characterized Cortes as jealously possessive of her. That Christmas Eve, he began kissing her. She had a short dress on, and he caressed her thigh. Garcia suggested that they go into the bedroom so that her 13-year-old daughter, T.S., would not see them. Cortes told Garcia to cook some dinner. But she had no food to cook. So, they went into the bedroom.

¶ 10       Cortes grabbed Garcia and pushed her onto the bed. He was upset and aggressive. He handled her roughly. She told him not to touch her in that violent manner. He bit her on the neck, causing her pain. Garcia continued:

> "A. And then when I told him to stop, I didn't want him to force it on me, he said that I had to do what he wanted and that what he—and I couldn't say anything. I had to be quiet. When I was—that he would get more upset, I would just go ahead and let him.
>
> Q. What happened next?
>
> A. Try to stop things, but, with the strength he had, I couldn't."

Cortes persisted in "[d]oing the sex thing *** in a forceful way." After biting her on the neck, he lifted her dress and pulled down her panties. Garcia testified:

> "[H]e penetrated me in my vagina several times. He turned me around. He then penetrated my anus. I was asking him to stop. I told him to stop, my daughter needed to spend time at the Christmas dinner, and he had to leave. He said, 'I'll leave when I want to, and I'll stop when I want to.'
>
> Q. (By Ms. Scarborough [(prosecutor)]). Then what happened?
>
> A. At that moment, he decided he had to urinate, and he urinated all over my bed and also on top of me, because he was saying[,] ['Y]ou're my prop—

MS. WONG [(DEFENSE COUNSEL)]: Objection.

THE COURT: Basis?

MS. WONG: Judge, I'll withdraw that.

A. Saying[,] ['Y]ou're my property.['] Marking his territory."

¶ 11    The prosecutor showed Garcia photographs that a nurse, Stefani Esme, had taken of her afterward in the hospital. Some of the photos showed bruises on Garcia's neck. Those bruises, Garcia testified, had been from Cortes's "sucking" and "holding" her neck. The photos of her legs showed the bruises where he had squeezed her with his hands. The bruises on her breasts had been inflicted by his mouth. Other photos showed bruises on her buttocks where he had slapped her.

¶ 12    After he was done having sex with her, Cortes reminded Garcia that she "was prohibited from leaving." He warned her that "he was going to be checking up on [her]." In the hope that "he would leave peaceful[ly]," Garcia "just agree[d] to everything he was demanding." She assured Cortes that she would remain home. He left and did not return that Christmas Eve night.

¶ 13                    B. Text Messages From Garcia to Cortes

¶ 14    On cross-examination, defense counsel showed Garcia some text messages that she exchanged with Cortes on December 24 and 25, 2017. On December 24, for instance, Garcia texted Cortes, " [']You make me happy, thank you. And you know I love you. Happy Christmas—Merry Christmas.['] " In his text message in reply, Cortes called Garcia a " [']f***ing whore.['] " Garcia also sent Cortes a text message reading, " [']More kisses. You know I love you and we are in love. You left me dead, spanked, a good spanking, and I had to put a sweatshirt on so my daughter wouldn't see me. *** Okay, so it's devil, there's *** like 10 marks on my neck, but I love you.['] "

Garcia continued in this text message, " [']You drove me crazy. You made me feel like I was in heaven.['] "

¶ 15          In the preceding direct examination, Garcia explained that because Cortes tended to get upset "over everything," she "tried to maneuver things to try to make him feel good" because "he always had this idea of being *** very valiant." She "tried to find a way to make him tranquil, to relax, and [she] found that way by sending him the texts that [she] completely loved him by sending hearts, kisses, trying to make him feel like he was the only person that [she] was with."

¶ 16                    C. Garcia's Quitting Her Job in Obedience to Cortes

¶ 17          According to Garcia's testimony, she and Cortes sometimes quarreled, and then, for a while, she would stop sending him text messages. The prosecutor asked her:

"Q. [W]hat would he tell you about his side of the fight?

A. A lot, because I worked at a place where he didn't want me to work. I felt very comfortable there where I could—I could control my time, my schedule. He would get upset, he would prohibit me from going there, and I ended up quitting my job."

¶ 18           D. Garcia's Account of What Happened on December 25, 2017

¶ 19          On December 25, 2017, Cortes stopped by Garcia's trailer twice. The first time was around 6 p.m. Cortes talked about the day before, and they had sex. This time, as he was kissing her and touching her, she "accepted it so that the same thing that happen[ed] the day before [would not] happen again."

¶ 20          After having sex with Garcia, Cortes ordered her to hand over her cell phone. She complied. He warned her that he would return when he had finished checking her phone and that if the phone contained anything he did not like, he would "kick [her] ass." He left with her phone.

Garcia instructed T.S. that if, upon his return, Cortes carried through with that threat—if he raised a hand against Garcia—T.S. (who, apparently, had her own cell phone) was to call the police.

¶ 21 A couple of hours later, Cortes returned and knocked on the door of Garcia's trailer. When Garcia opened the door, she was holding I.A.-J. Garcia demanded that Cortes return her phone. He told her that her phone contained messages that did not "sit well with him" and that Garcia, therefore, was a liar and a whore. He commanded her to go into the bedroom. This time, she did not comply. He asked her, " ['W]hy don't you ask me for money? Why is it you have to go tell other people?['] " She replied that it was none of his business, and she insisted that he return her phone and leave. She opened the front door for him, still holding their eight-month-old child in her arms. Cortes raised his hand to hit Garcia, who tried to dodge the blow. There was not quite enough room to maneuver, and "he still landed on [her] skin when he hit [her]." That was when Garcia told her teenage daughter, T.S., to call the police. Cortes turned around and saw T.S. on the phone. He asked T.S. if she knew what her mother was—if she knew that her mother was, as he put it, a whore and, as he put it even more explicitly, someone who sold her body for money. He left. Soon afterward, the police arrived.

¶ 22 E. T.S.'s Account of What Happened on December 24, 2017

¶ 23 T.S., who was 14 years old at the time of the trial, testified that, during the three years when Garcia and Cortes were in a relationship, Cortes would come over on the weekends and he and Garcia would have sex. Sometimes, T.S. could hear sexual noises coming from the bedroom. Cortes would bring gifts for I.A.-J. and money for Garcia.

¶ 24 On Christmas Eve in 2017, around 9 or 10 p.m., Cortes stopped by, and they opened presents. T.S. testified that she and Garcia had plans to go to a friend's Christmas party but that they ended up not going "because [Cortes] would not let [her] mother go." After the presents were

opened, Garcia told T.S. to hold I.A.-J., and Garcia and Cortes went into the bedroom. T.S. and her little sister stayed in the living room, watching television. While Garcia and Cortes were in the bedroom, T.S. was talking with a friend (whose name appears to be unspecified in the record). The friend commented that she did not like the sounds coming from the bedroom. The bedroom door was slightly ajar, allowing T.S. to see Cortes's reflection in a bedroom mirror. The friend urged T.S. to throw some things, I.A.-J.'s little toys, at the bedroom door, which was about 35 feet away. The impact from the toys caused the bedroom door to swing open a little further. T.S. testified:

"A. I saw him forcing my mom to have sex with him. I really didn't—

MS. WONG: Judge, I'm not able to hear responses.

THE COURT: Okay. Ms. Wong, would it be helpful for you to move closer? I mean, I'm going to ask you to do your best to keep your answers slow and as loud as you can. Okay?

You don't have to come up, but you can if it helps.

MS. WONG: It probably will.

Q. (By Ms. Scarborough) How would you describe, if you can, [Cortes's] demeanor or his mood?

A. Um, I would describe him like he seemed a little aggressive. Maybe just aggressive, and, yeah.

Q. How long—for how long were you able to see into the bedroom?

A. I was able to see for probably about like five, ten minutes.

Q. Did the door eventually get shut?

A. Yes.

Q. Who shut the door?

- 7 -

A. [Cortes].”

¶ 25    Garcia never yelled or asked for help. Eventually, she and Cortes emerged from the bedroom, whispering. T.S. could not hear what they were saying. Cortes left around 10 or 11 p.m., and "that's when [her] mom was very sad and frightened." Garcia was shaking and seemed to be on the verge of weeping. T.S. hugged her and asked her what was wrong.

¶ 26    The prosecutor showed T.S. some photos taken of Garcia in the hospital. One of the photos, T.S. testified, was "of the hickey he forced on [her] mom." The prosecutor showed T.S. another photo. She testified:

> "A. All right. It's another picture of hickeys that he had forced on my mom.
>
> MS. WONG: Judge, I'm going to object to that characterization.
>
> THE COURT: Sustained, sustained.
>
> Q. (By Ms. Scarborough) Are there injuries on those photographs?
>
> A. None—I don't see except for the hickeys.
>
> Q. Okay. And with regard to those hickeys or bruises on her neck area, were those there before [Cortes] came over on Christmas Eve? ***
>
> * * *
>
> A. No, those were not there.
>
> Q. Okay. When did you first notice the bruising on your mom?
>
> A. When he left on Christmas Eve."

¶ 27                    F. Jones's Description of Cortes's Arrest

¶ 28    After a Bloomington police officer, Pedro Diaz, interviewed Garcia, two other Bloomington police officers, Paul Jones and Benjamin Smith, went to Cortes's residence to arrest him.

¶ 29        Cortes resided in a trailer, a mobile home. Jones and Smith arrived there at about the same time, in separate vehicles. Jones walked to the back door of the trailer and waited in a corner in case Cortes tried to flee out the back. Smith walked to the front door and knocked. Jones heard someone walking inside the trailer, near the back door, and then he heard the back door being unlocked. Cortes exited the trailer through the back door. Jones identified himself as a Bloomington police officer, told Cortes he was under arrest, and tried to move Cortes's hands behind his back so that he could handcuff him. Cortes, however, was wearing a coat, which he slipped out of, and he retreated into the trailer.

¶ 30        Jones followed Cortes into the residence, again telling him he was under arrest and ordering him to put his hands behind his back. Cortes's wife, Contreras, told Jones to leave, and she got between him and Cortes. Jones ordered Contreras to step back and Cortes to stop resisting. Smith was still waiting at the front door, and Jones radioed him to come in through the back door. After Smith came around and entered the trailer, the two of them, Jones and Smith, pushed Cortes and Contreras into a more open area of the trailer so that they would have more room to try to get the handcuffs on Cortes. Jones and Smith pushed Cortes facedown onto a couch, but Cortes rolled over onto his back. Then they pulled him off the couch and onto the floor.

¶ 31        Jones testified that Cortes "continued to try to keep his arms in front of his body." The prosecutor asked Jones:

> "Q. When you say you [*sic*] were trying to keep his arms in front of his body, how would you describe the amount of strength he was putting into that?
>
> A. I would say he was pulling all of his strength to keeping his arms from being brought back behind him to be handcuffed.
>
> Q. What happened next?

A. Once he was in handcuffs, we stood Mr. Cortes back up onto his feet, asked him if he was hurt. He didn't respond to that. And then Officer Smith began searching him at that time."

¶ 32                                    F. The Body Camera Video

¶ 33        Smith was in uniform when he went to Cortes's residence to arrest him, and he had a body camera clipped to his uniform. Upon his return to the police station, Smith logged the video footage into evidence. The parties stipulated to the foundation for video.

¶ 34        The video shows Smith arriving at Cortes's trailer, walking around the perimeter of the trailer, and then approaching the front door. Music is playing inside. Smith knocks on the front door. Someone turns down the music. Smith knocks three more times. He waits at the front door and then takes off running to the back door. He enters the trailer through the back door, behind Jones and Cortes. Contreras can be heard asking, "What happened?" and "What is the problem?" Smith's body camera falls off his uniform and onto the floor. The two police officers order Cortes to get onto the floor and to put his hands behind his back. Also, they order Contreras to stay back. Jones tells Smith that "he got this one." The ratcheting of handcuffs can be heard. A few seconds later, Smith reports that Cortes is in custody.

¶ 35        Contreras again inquires what the problem is. Jones answers that "[Cortes] tried to sneak out the back door on [him], and then[,] when [he] tell[s] [Cortes] to stop[,] [Cortes] comes back in the house." Contreras asks Cortes if he is okay. Cortes answers softly. Again Smith orders Contreras to get back, and he warns her that if she comes close to Cortes one more time, she will be pepper-sprayed. Both police officers keep telling her to stay back. She says, "[What] is the problem with you[?] [Y]ou is stupid." Smith asks Cortes if he has any injuries. He does not answer. Contreras tells the police officers that she has a child in the home. Jones reports to the dispatcher

that there will be a resisting charge against Cortes, who is still on the floor, handcuffed. Smith tells Cortes to roll onto his side, and Smith finds his body camera and reattaches it to this uniform. The video then shows Cortes standing, in handcuffs, being searched by the police officers.

¶ 36        As the police officers are on their way out of the trailer, with Cortes in their custody, the video shows Cortes's teenage daughter (whose name appears to be unspecified in the record). Smith informs the daughter and the wife that Cortes is going "to be at the police department[.]" Contreras asks the police officers if she can "pay a fine." The daughter likewise asks if they can "pay anything." One of the police officers explains that the earliest that Cortes can bond out will be 10 a.m. the next day. Jones tells Contreras and the daughter that they may contact the jail in the morning. Then the police officers exit the trailer with Cortes and walk him to the squad cars, which are parked down the street.

¶ 37        As they are walking, Smith tells Cortes to use his feet. Jones asks Smith if he wants Jones to transport Cortes to the jail because he, Jones, has a "cage." Smith answers, "Yeah, sure." Smith opines to Jones, though, that Cortes is "too drunk to fight anymore." He puts Cortes in the backseat of Jones's squad car.

¶ 38        In the video, Jones then recounts to Smith what he did when he arrived at Cortes's residence. He explains that he walked around the stairway because he was thinking, "Well, he might jump out here." He saw Cortes hug Contreras, and then he saw Contreras and their daughter walk toward the front door. At that point, defense counsel made a hearsay objection. The prosecutor responded that she was unopposed to the hearsay objection and that, besides, she did not think that the video showed anything further that was relevant.

¶ 39        G. The Interview of Cortes in the Police Station

¶ 40        Diaz read Cortes the *Miranda* warnings and interviewed him. All this took place in Spanish, and the interview was recorded on video. At first, Cortes denied that the wounds on Garcia were from the night they had spent together. Then he explained to Diaz that Garcia liked to be hit and that she liked it when he left marks on her neck—he and she understood one another that way. Cortes denied that Garcia had asked him to stop. He added that Garcia "wanted to have sexual relations because she was a whore." Cortes admitted pushing Garcia in the face when he was taking her phone from her. He insisted, however, that he never forced himself on her sexually. Rather, "all that happen[ed]" every time he went to see her.

¶ 41                              II. ANALYSIS

¶ 42                    A. Showing Too Much of the Video

¶ 43        The right to counsel under the sixth amendment of the United States Constitution (U.S. Const., amend. VI) includes the right to "effective" assistance from counsel (*People v. Cole*, 2017 IL 120997, ¶ 22), meaning assistance that is "within the range of professionally reasonable judgments" (*Strickland v. Washington*, 466 U.S. 668, 699 (1984)). In Cortes's view, it was outside the range of professional reasonableness for defense counsel to sit silently as the prosecutor continued playing the body camera video after the jury saw, from the video, that the police had succeeded in getting the handcuffs on Cortes. From that point onward, Cortes argues—from the point when he was handcuffed and arrested—the video was irrelevant and was unfairly prejudicial to him, and defense counsel should have objected on those grounds. Cortes maintains that none of the video footage was relevant after the handcuffing. He was not accused of resisting after he was handcuffed. Therefore, he argues that "[c]ounsel should have moved to redact the prejudicial portions of the video" and that because defense counsel neglected to do so, "the jury was permitted

to consider without limitation seven minutes of irrelevant and prejudicial events." The video-recorded events to which Cortes refers were as follows.

¶ 44                    1. *Showing Cortes Standing in Handcuffs and Being*

*Searched in Front of His Wife and Daughter*

¶ 45          Cortes complains that, in the video footage, the jury saw him "in handcuffs while being searched by two officers in front of his wife and daughter." He quotes from a decision in which the appellate court held that "a brief, unaggravated viewing of the defendant in handcuffs was not so prejudicial as to deprive the defendant of a fair trial." *People v. Schaefer*, 217 Ill. App. 3d 666, 671 (1991). The corollary to that holding, Cortes reasons, is that if the jury's viewing of the defendant in handcuffs is lengthy and aggravated, the defendant is deprived of a fair trial—and by "aggravated," Cortes seems to mean that his wife and daughter saw him standing helplessly in handcuffs and being searched. Citing *People v. Lewis*, 165 Ill. 2d 305, 329 (1995), he asserts that when he is shown to the jury in handcuffs, the jury is "influenced *** to decide the case on grounds other than the State's proof of the charged offenses."

¶ 46          In *Schaefer*, however, handcuffing was irrelevant to the State's case. The defendant in *Schaefer* was charged only with possessing cannabis with the intent to deliver it. *Schaefer*, 217 Ill. App. 3d at 667. Handcuffing had nothing to do with that charged offense. In the present case, by contrast, handcuffing Cortes was relevant to the State's proof of count IV, resisting a peace officer. The State had to prove that Smith, a Bloomington police officer, was trying to perform an authorized act within his official capacity, namely, apprehending Cortes. See 720 ILCS 5/31-1(a) (West 2016). According to count IV, Cortes knowingly resisted that performance by refusing to place his hands behind his back. In other words, he resisted as Smith was trying to handcuff him.

That is what the State had to prove: an attempt by Smith, resisted by Cortes, to handcuff Cortes's hands behind his back.

¶ 47 Cortes does not dispute that the part of the body camera video where Smith and Jones struggled with Cortes to get the handcuffs on him was relevant to proving count IV. Once that much is granted, there was no prejudice from further showing Cortes standing in handcuffs and being searched in the presence of his wife and daughter. After all, Jones *testified* that, once Cortes was handcuffed, they stood him on his feet and Smith searched him. Surely, the defense suffered no detriment from the jury's seeing, on the video, the facts to which Jones testified.

¶ 48 A claim of ineffective assistance has two elements, deficient performance and resulting prejudice. *People v. Shipp*, 2020 IL App (2d) 190027, ¶ 31. As the supreme court teaches, "we may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17. How did seeing Cortes wearing the handcuffs add to the prejudice of seeing the handcuffs being put on him in the first place? It did not.

¶ 49 There can be no prejudice if what the jury saw in the video was unremarkable in the context of Jones's testimony and what the jury already had seen earlier in the video. Quite apart from Jones's testimony, the jury naturally would have assumed that once the handcuffs were put on Cortes, the handcuffs would have stayed on him. In that respect, the video added nothing to what the jury already would have expected. Likewise, the body search was only to be expected. It is common knowledge that arrestees are searched. Nor would it have been unexpected or further stigmatizing that Cortes's continued wearing of the handcuffs and the searching of his person took place in the presence of his wife and daughter. After all, Cortes had fled back into his residence, and in the presence of his wife and daughter, he had resisted being apprehended. If, because of

Cortes's actions, the police officers had to wrestle him in the presence of his family, Cortes already looked disreputable—by his own doing. One reason why resisting a peace officer is a bad idea is that proof of the resistance, *i.e.*, testimony and a body camera video, will make one look bad to a jury of one's peers. Cortes could not have looked worse by afterward undergoing, in the presence of his family, a routine search incident to arrest.

¶ 50 Therefore, we find no prejudice from the jury's seeing Cortes, on video, standing in handcuffs and being searched in the presence of his wife and daughter. Omitting that footage would have yielded no reasonable probability of a different outcome. See *id.* ¶ 18.

¶ 51 2. *Transporting Cortes in Jones's Car Because It Had a "Cage"*

¶ 52 In the video from the body camera, Jones asks Smith if he wants him, Jones, to transport Cortes to the jail because Jones's squad car "has a cage." Smith answers, "Yeah, sure." Cortes argues that "[t]he jurors' viewing of Cortes in custody being searched with handcuffs, and then being placed in a 'cage' is prejudicial because it encourages the jury to decide the case based on contempt for Cortes and possibly Contreras, and sympathy for his daughter."

¶ 53 We disagree. The self-inflicted prejudice came from Cortes's resisting arrest, not from the measures the police officers took in reasonable response to the resistance. It added nothing to Cortes's flawed image that, in the trip to the jail, Jones and Smith took commonsense precautions with a man whom they had just had to wrestle to get the handcuffs on him. The "cage," the standard metal grille separating the backseat from the front seat, suggested nothing beyond "Here is a man who resisted arrest"—which the jury already knew. If an arrestee physically struggles against being arrested, it is only natural for police officers, afterward, to treat that arrestee warily. In such circumstances, it is not the police officers' wary treatment of the arrestee that makes

the arrestee look bad but, rather, the arrestee's unlawful resistance that prompted the wary treatment. So, again, we find no prejudice. See *id.*

¶ 54                                3. *Misbehavior by Contreras*

¶ 55            In the video, the police officers repeatedly order Contreras to stay back. Jones threatens to use pepper spray on her if she does not step back, away from Cortes. Contreras yells at the police officers, calling them "stupid." She questions Cortes in Spanish. She asks the police officers if she can pay a fine. Cortes claims that all of this conduct by his spouse "was inflammatory and cast a negative light on [him] unrelated to the offenses at issue."

¶ 56            We are unconvinced. For one thing, there is nothing disreputable about speaking in Spanish. For another thing, even though Cortes and Contreras were married, they were separate individuals who made their own choices. No fair-minded trier of fact would attribute any bad or unseemly behavior by Contreras to Cortes. Again, we find no prejudice to the defense. See *id.*

¶ 57                                4. *Prior Consistent Statements*

¶ 58            Cortes contends that the jury "was *** exposed to inadmissible hearsay and testimony that violated the rule against consistent statements when," in the video, "it heard Jones recount to Smith what happened at the back door of Cortes'[s] home."

¶ 59            It is true that, "[i]n general, proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony." (Internal quotation marks omitted.) *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99. There is an exception to that general rule: "prior consistent statements are admissible to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, and such evidence is admissible to show that he told the same story before the motive came into existence or before the time of the alleged fabrication." (Internal quotation marks omitted.) *Id.*; see

- 16 -

also Ill. R. Evid. 613(c) (eff. Jan. 1, 2011). That exception is inapplicable in this case because there was no suggestion that Jones was motivated to testify falsely or that his testimony was of recent fabrication.

¶ 60        As the State observes, however, the erroneous admission of a prior consistent statement rarely causes prejudice. The appellate court has remarked that, under the standard of review applicable to mere evidentiary errors (in contrast to constitutional errors), "the erroneous admission of prior consistent statements would seldom warrant reversal." *Id.* ¶ 105. In other words, seldom will there be "a reasonable probability *** that the jury would have acquitted the defendant in the absence of the improperly admitted prior consistent statements." *Id.* ¶ 106. The appellate court explained in *Stull*:

> "Absent a charge of recent fabrication or a motive to lie, a jury would place little significance on the fact that a witness said the same thing twice—that is, that the witness gave a prior statement consistent with the witnesss'[s] trial testimony. Indeed, a witness'[s] doing so would be the jury's natural expectation. In other words, the erroneous admission of such statements should rarely result in any meaningful prejudice to a defendant." *Id.* ¶ 105.

"Prejudice" means a reasonable probability that, but for the claimed error by defense counsel, the outcome of the trial would have been different. See *Hale*, 2013 IL 113140, ¶ 18. We conclude that if the prior consistent statement by Jones had been excluded, there would be no reasonable probability of an acquittal. As Cortes says in his reply brief, "[t]he jury watched [him] attempt to defeat an arrest," and the jury "heard the officers struggle to take him into custody." That was the notable part of the video, and the rest was an anticlimax. Cutting out the unremarkable video footage that came afterward would have made no difference in the outcome.

¶ 61                                    B. Character Evidence

¶ 62                                    1. *Multiple Girlfriends*

¶ 63        Garcia testified that Cortes had threatened her. The prosecutor asked her what the threats were. Garcia answered:

> "A. He said that if he found out I was with someone else—because he always wanted me to be with him—and if he found out I was with somebody else, he was going to come to where I live and burn my trailer. Or he was going to hit me with the automobile so that I couldn't walk so I wouldn't be able to walk anymore.
>
> Q. Were those specific things that he had said to you?
>
> A. Yes.
>
> Q. Were you aware of whether or not the defendant had a relationship with anybody other than you?
>
> A. Yes.
>
> Q. What did you know about that?
>
> A. His wife told me.
>
> Q. What did his wife tell you?
>
> A. If I knew that I wasn't the only person that he was with, because he was with many, with several.
>
> Q. When did you learn that?
>
> A. The first day I came to court. In the past, he has been with other women that I have found out about.

* * *

Q. *** Do you remember when it was that you were in court to learn that information?

A. Twenty-seventh of December."

¶ 64 Because Garcia, in this context, was testifying to what occurred "around Christmastime, 2017," the "[t]wenty-seventh of December" must have been December 27, 2017— which was after she broke off her relationship with Cortes. The State does not seem to dispute that Cortes's extramarital affairs with multiple women reflected badly on him and could be considered an uncharged bad act. Even so, the State argues, defense counsel could have made a reasonable strategic choice of letting that evidence in so as to make Garcia look licentious and unprincipled and, hence, not credible.

¶ 65 As Cortes points out, however, that argument does not quite work, considering that it was not until after Garcia ended her relationship with Cortes that she found out that he had several girlfriends besides herself. It appears that the State's purpose in bringing out those other relationships was to suggest that Cortes, in addition to being despotic, was hypocritical. He unreasonably held Garcia to a different standard than that to which he held himself. He forbade her, on pain of crippling injuries, to be "with somebody else," and yet he himself had several other girlfriends. It was, in short, character evidence.

¶ 66 And yet we find no prejudice, considering that the jury already knew that Cortes was unfaithful to his wife. The jury knew that much just from Cortes's relationship with Garcia. While married to Contreras, he was having weekly sex with Garcia. He even had a child by her. Infidelity is infidelity. Inconsistency is inconsistency. That Cortes additionally had several other girlfriends would have added little to any unfavorable impression already created by his relationship with Garcia. He was in a relationship with multiple women—the jury already knew

that. Whether it was just one other woman (Garcia) or three other women would have made no logical difference. Either way, Cortes was not monogamous. Therefore, we find no reasonable probability of a different outcome had defense counsel objected to, and the circuit court excluded, Garcia's testimony that she was not "the only person that [Cortes] was with, because he was with many, with several." See *id.*

¶ 67                                    2. *Making Garcia Quit Her Job*

¶ 68        Cortes faults his defense counsel for omitting to object to Garcia's testimony that he, Cortes, had forced Garcia to quit her job. According to Cortes, that testimony was inadmissible character evidence designed to persuade the jury to find him guilty simply because he was, supposedly, a bad person. See Ill. R. Evid. 404(a) (eff. Jan. 1, 2011).

¶ 69        For two reasons, however, the testimony had relevance other than as character evidence. First, as the State explains, the testimony was relevant to Garcia's lack of consent. The State reasons as follows, and the reasoning strikes us as legitimate. Because of Garcia's resentment that Cortes had forced her to quit a job that she particularly liked—or because of that grievance added to her other, more recent grievances against him—Garcia's disaffection had reached the point where she wanted to break off her relationship with him, or at least not have sex with him on December 24, 2017. In other words, he had made her give up her job, and if that was not bad enough, he now was making her give up her and her daughter's Christmas dinner at a friend's house. This latest outrage, on top of the others, was too much for Garcia. The accumulated indignities then reached critical mass, causing her to want to keep Cortes physically at arm's length. On that logic, Cortes's forcing her to quit her job makes it more probable than it otherwise would have been that she did not consent to have sex with him on December 24, 2017—in other words, that he had sexual intercourse with her by force, an element of criminal sexual assault (720

ILCS 5/11-1.20(a)(1) (West 2016)). See *People v. Weis*, 120 Ill. App. 3d 597, 600 (1983) (reasoning that the defendant's previous mistreatment of the victim "was relevant to show the principal fact in issue, whether the victim had consented, by evidence showing the extent to which the prior relationship of the parties had deteriorated").

¶ 70        Second, the State had to explain some fawning text messages that Garcia sent Cortes after he sexually assaulted her: text messages such as " '[y]ou make me happy,' " " 'thank you,' " and " '[y]ou made me feel like I was in heaven.' " The State could do so by showing the extent of the tyrannical control that Cortes exercised seemingly over every aspect of her life. She had to gush over him in text messages. It was a prudential tactic. She was completely under his thumb. Just as she felt compelled to quit her job in order to please him, she felt compelled to placate him with flattering text messages.

¶ 71        As Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) says, "[e]vidence of other *** wrongs *** is not admissible to prove the character of a person in order to show action in conformity therewith" (except as allowed by statutory law), but "[s]uch evidence may *** be admissible for other purposes." The two purposes we have explained here are other relevant purposes, making admissible the bad-act evidence that Cortes forced Garcia to quit her job. Refraining from making futile objections to admissible evidence is not ineffective assistance. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 34.

¶ 72                            C. T.S.'s Testimony

¶ 73        T.S., Garcia's teenage daughter, testified that she was home on December 24 and 25, 2017, and that she "saw [Cortes] forcing [her] mom to have sex with him." Also, when handed a photograph taken of Garcia on December 25, 2017, T.S. testified that it showed "the hickey [that Cortes had] forced on [her] mom."

¶ 74         Cortes claims that by not objecting to those two parts of T.S.'s testimony, defense counsel rendered ineffective assistance. "T.S.'s testimony was inadmissible," Cortes argues, "because its probative value was outweighed by its prejudicial effect."

¶ 75         Probative value and prejudicial effect, however, are not necessarily antithetical. Evidence can have probative value precisely because of its prejudicial effect on the defense. Evidence that tends to prove an element of the charged offense is prejudicial or detrimental to the defendant—and such evidence is admissible for that very reason.

¶ 76         Granted, under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), evidence, even though it is relevant, "may be excluded if its probative value is substantially outweighed by the danger of *unfair* prejudice." (Emphasis added.) But the emphasized qualifier is crucial. Evidence is *unfairly* or *unduly* prejudicial only if it "cast[s] a negative light upon the defendant *for reasons that have nothing to do with the case on trial*." (Emphasis in original and internal quotation marks omitted.) *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 30.

¶ 77         That Cortes used force on Garcia when he entered her residence on December 24, 2017, had *something* to do with the case on trial. In fact, it had *a lot* to do with the case on trial. Count I, for example, charged that on December 24, 2017, he committed criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)) in that he "committed an act of sexual penetration between his penis and the vagina of [Garcia] by the use of force of the threat of the use of force." T.S.'s testimony that she "saw [Cortes] forcing [her] mom to have sex with him" was relevant to the statutory element of force. The same was true of T.S.'s testimony that a photograph showed "the hickey [that Cortes had] forced on [her] mom." Therefore, while the identified parts of T.S.'s testimony were prejudicial to Cortes, they were not unfairly prejudicial to him, and defense counsel would have lacked a valid ground of objection. Again, defense counsel does not render ineffective

assistance by refraining from making groundless objections. See *Massey*, 2019 IL App (1st) 162407, ¶ 34.

¶ 78                                          III. CONCLUSION

¶ 79         For the foregoing reasons, we affirm the circuit court's judgment.

¶ 80         Affirmed.