2019 IL App (1st) 162407

FIRST DISTRICT,
SECOND DIVISION
June 4, 2019

No. 1-16-2407

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 14 CR 06853-01 |
| | ) | |
| CLINT MASSEY, | ) | Honorable |
| | ) | Vincent Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Lavin and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Clint Massey, and his codefendant, Courtney Ealy, were convicted of murder in the shooting death of Javan Boyd. The State's evidence showed that Boyd, a private taxi driver, was waiting for his fare when Massey and Ealy approached the taxi and shot Boyd, although there was conflicting evidence as to who did the actual shooting.

¶ 2    On appeal, Massey argues that (i) his counsel was ineffective for not more vigorously pursuing a defense theory that Ealy was the sole shooter; (ii) the trial court erred in allowing hearsay regarding what Massey was wearing on the night of the murder; (iii) a mistrial should have been granted because the victim's family made an outburst during trial; and (iv) prior to trial, the court erred when it conducted a material witness hearing without notice to Massey. We decline to adjudicate Massey's last contention since it relies on matters outside the record and is therefore inappropriate for resolution on direct review. Finding no merit in his other claims of error, we affirm.

¶ 3                                        BACKGROUND

¶ 4            On the night of February 21, 2014, defendants attended a party at 39th Street and Wentworth Avenue, in the Wentworth Gardens housing project. Massey wore a tiger-striped jogging suit, and Ealy wore a Burberry shirt and white pants. Also attending the party were Kaprice Johns, Jasmine Brown, Germontay Carpenter, T'Keyah Herbert, and Jerome Anderson.

¶ 5            Defendants left the party with Herbert in Herbert's van.[1] After they left, Johns, who remained at the party, got into an argument with a group of women known as "Pretty in Pink" because Johns disliked the song that was being played. As they argued, someone fired a gun into the air multiple times. Johns did not see who fired the shots, but she guessed that the shooter wanted to stop the argument because it was too loud. The gunshots did not hit anyone.

¶ 6            After the altercation, Johns left the party with Brown, Carpenter, and Anderson. They left in Johns's car, with Anderson driving. Carpenter made a phone call to the either Massey or Ealy, who were still with Herbert in her van, and told them about the altercation at the party. Carpenter put the call on speakerphone, and Brown could hear Ealy's voice, which she recognized, on the other end.

¶ 7            Anderson drove to Wendy's, where they met up with a red car and Herbert's van. Ealy and Massey exited the van and got into the red car, along with a man named D-Rose. (A fourth man, unidentified at trial, was the driver.) The three vehicles drove back toward Wentworth Gardens in a convoy: first the red car, then Herbert's van, then Johns's car. According to Johns, they intended to "see who shot at [them]" and "deal with the matter."

---

[1]At trial, Herbert admitted attending the party, but she denied seeing defendants at the party or knowing anything about the shooting. She was impeached with a signed statement she made to Assistant State's Attorney Patrick Waller on March 4, 2014, which was admitted as substantive evidence. See 725 ILCS 5/115-10.1 (West 2014).

¶ 8        Meanwhile, Latoya Adams was visiting her mother in Wentworth Gardens. Around 3 a.m. on the morning of February 22, she called for a taxi to go to a friend's house. Boyd, who was driving a car that contained no outside indication that it was a vehicle for hire, was dispatched to the call.

¶ 9        As the three-vehicle convoy approached 38th Street and Princeton Avenue, they passed Boyd sitting in his parked car, waiting to pick up Adams. The three vehicles all made a U-turn and came to a stop. Massey, Ealy, and D-Rose exited the red car and approached Boyd's car from the passenger side.

¶ 10        Both Herbert and Johns witnessed the shooting. Herbert saw Massey and Ealy open Boyd's passenger-side door and then saw Massey firing a gun into the car. She heard four or five gunshots, after which Massey and Ealy returned to the red car and drove away.

¶ 11        According to Johns, Massey and Ealy spoke to Boyd, and then Johns saw "a light flash from the gun" and Boyd "jumping" as if he was getting shot. At trial, Johns said she did not see the actual gun, but in a prior statement to detectives, Johns identified Ealy as the shooter. After the shooting, D-Rose ran back to Johns's car and got inside, saying "shit" and "he's dead." Massey and Ealy ran back to one of the other vehicles, and all three vehicles drove away. As they left, Johns could see Boyd "slumped over" in his car.

¶ 12        The shooting was captured on surveillance cameras belonging to the Chicago Housing Authority, which owns the Wentworth Gardens housing project. The video footage was played for the jury. In the videos, three vehicles drove past Boyd's vehicle and then drove back the other way. The convoy leader, a red car, stopped next to Boyd's vehicle and two men got out, one wearing a striped track suit (Massey) and the other wearing a brown shirt and white pants (Ealy). They approached Boyd's car from the front passenger side and appeared to be talking to him.

Boyd's car started backing up but hit a vehicle parked a couple of feet behind him. (At this point, D-Rose got out of the red car and ran back toward Johns's car.) There was a bright flash of light near Ealy's hand; Boyd's car surged forward and hit another parked car. Massey and Ealy ran forward to look in the front passenger window. Ealy returned to the red car, Massey followed him a few moments later, and the three vehicles drove away.

¶ 13    Adams came outside to pick up her ride and found Boyd hanging out of the driver's side of his car. She asked him if he was okay. He did not respond. Someone else had already called the police, so Adams called the taxi company to inform them that their driver had been shot. She then remained at the scene and cooperated with police when they arrived.

¶ 14    After leaving the scene of the shooting, all three vehicles drove to the Shell gas station at 55th Street. Video surveillance footage from the gas station showed Ealy walking toward Johns's car. (Massey did not appear in the video.) According to Johns, Ealy entered her car, told her that he dropped his iPhone at the scene of the crime, and asked her to help him retrieve it. Ealy also told Johns about the shooting: he said that he asked the victim if he was "from over here" and specified the part of Wentworth Gardens where the party had been. The victim said he was. Ealy then said "man down," which Johns understood to mean the victim was dead.

¶ 15    Johns drove back to the scene of the crime, but police had already cordoned off the area and would not allow her to enter. Officers did, in fact, find an iPhone in the middle of the street near the victim's vehicle.

¶ 16    A latent fingerprint impression recovered from Boyd's passenger-side window was identified as belonging to Ealy. Massey's fingerprints were not found at the scene. Inside Boyd's car, the police recovered three 9-millimeter fired cartridge casings and two 9-millimeter fired bullets; additionally, the medical examiner recovered two more 9-millimeter bullets from Boyd's

chest. Kellen Hunter, a firearms examiner for the Illinois State Police, determined that the bullets were all fired from a single gun, and the cartridge casings were all fired from a single gun. He was unable to determine whether the bullets and cartridges were fired from the same gun, since it is impossible to match a fired bullet to a fired cartridge casing.

¶ 17    Before to trial, the trial court asked Ealy's counsel if she was moving for severance. Counsel responded that she had not yet filed the motion, but she could file it later that day. The trial court asked the basis for the motion, to which Ealy's counsel replied: "We're just moving to make a motion for severance. That's our sole basis." The State responded that severance was not necessary because neither defendant made a statement and "[a]ll the other witnesses and evidence go to both defendants." The court then denied the motion. Massey's privately retained counsel was not present when this occurred; he was apparently late to court that day. When he arrived, the court informed him that Ealy had made a motion for severance that was denied. Massey's counsel did not object, nor did he orally request or file his own motion for severance.

¶ 18    In closing argument, Massey's counsel argued that the State's witnesses were "telling the police nonsense about who the shooters were" in order to avoid being charged with the murder themselves. He pointed out that Massey was not present for the altercation at the party, his voice was not heard in Carpenter's phone call to Ealy, and his face could not be identified in the blurry surveillance video of the shooting. Massey's counsel also stated, "Of those three eyewitnesses, did any one of them point to my client and say he was the shooter? *** None."

¶ 19    Likewise, Ealy argued,

"Not one single witness took that stand and said Courtney Ealy shot a weapon. *** [T]here's no testimony *** that Courtney Ealy ever shot a gun. And I am not insinuating

that Clint Massey shot a gun. I am insinuating that those women on that stand had reason to lie."

¶ 20    Defendants were tried before a single jury. For both defendants, the State sought a conviction for first degree murder and a 15-year sentence enhancement for being "armed with a firearm" during the commission of the offense. The jury was instructed concerning accountability as to both the murder and the firearm allegation. The jury returned a general verdict finding both defendants guilty of first degree murder, but it found that the firearm allegation was proven only as to Massey. Following a sentencing hearing, the trial court sentenced Massey to 39 years' imprisonment.

¶ 21                                    ANALYSIS

¶ 22    Massey argues that (i) his trial counsel was ineffective for not more vigorously pursuing a defense theory that Ealy was the sole shooter; (ii) the trial court erred in allowing Brown's hearsay statements regarding what Massey wore at the time of the offense; (iii) a mistrial should have been granted when the victim's family made an outburst during trial; and (iv) prior to trial, the trial court erred when it declared Johns to be a material witness without notice to Massey.

¶ 23                      Ineffective Assistance of Counsel

¶ 24    Massey argues that his trial counsel should have more vigorously pursued a theory that Ealy was the sole shooter and that Massey was not accountable for Ealy's actions. More specifically, Massey argues that counsel should have (i) moved to sever trial, (ii) objected to admission of incriminating hearsay statements from Ealy, (iii) argued in closing that Ealy was the sole shooter, and (iv) objected to Ealy's closing argument that Ealy was not the shooter.

¶ 25    To establish ineffective assistance of counsel, a defendant must prove that counsel's performance was objectively unreasonable and, but for counsel's errors, the outcome of the

proceeding would have been different. *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36)). In assessing the first *Strickland v. Washington*, 466 U.S. 668 (1984), prong, we show great deference to counsel's strategic decisions (*People v. McGee*, 373 Ill. App. 3d 824, 835 (2007) (citing *Strickland*, 466 U.S. at 689 (there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"))), making every effort " 'to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time.' " *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 23 (quoting *Strickland*, 466 U.S. at 689).

¶ 26    A defense decision not to seek a severance is generally considered trial strategy. *Id.* ¶ 24. Moreover, it is well established that "defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Gabriel*, 398 Ill. App. 3d 332, 346 (2010). Two sources of potential prejudice are (i) when a codefendant makes hearsay admissions that implicate the defendant and (ii) when codefendants' defenses are " 'so antagonistic to each other that one *** cannot receive a fair trial jointly with the others.' " *People v. Ngo*, 388 Ill. App. 3d 1048, 1058 (2008) (quoting *People v. Bramlett*, 211 Ill. App. 3d 172, 178 (1991)).

¶ 27    Here, Ealy made no hearsay admissions that implicated Massey. Ealy implicated *himself* by telling Brown that he asked the victim if he was from "over here" and then saying that "it was man down" (*i.e.*, that the victim was dead), but Ealy did not mention Massey, let alone place Massey at the scene of the crime or reference any role Massey might have played in the shooting.

¶ 28    Massey nevertheless argues that his defense was antagonistic to Ealy's defense since multiple witnesses placed both defendants at the scene of the shooting, but the ballistic evidence suggested a single murder weapon, and there was conflicting evidence as to who wielded it.

¶ 29        Although we agree that Massey and Ealy's defenses were potentially antagonistic, we disagree that any resulting antagonism was prejudicial to Massey. On the contrary, without the benefit of hindsight, Massey's attorney could reasonably have preferred a joint trial because the State's evidence against Ealy was stronger, and if the jury chose to convict just one man, it would more likely be Ealy. When Carpenter called to discuss the altercation at the party, Brown recognized Ealy's voice (and not Massey's) on the other end. Ealy was the one who asked Boyd if he was from "over here," and Ealy was the one who bragged, "[M]an down." Ealy's fingerprint, and not Massey's, was found on Boyd's car window. Ealy also left his iPhone at the scene of the crime and went with Johns and Brown to try and retrieve it, which was chronicled in detail at trial.

¶ 30        In light of these facts, as well as the incontrovertible evidence that a shooting took place, it was reasonable for Massey's counsel not to seek severance. Counsel could have calculated that, faced with two defendants but a probable single shooter, the jury would be more likely to convict Ealy and acquit Massey. See *Fields*, 2017 IL App (1st) 110311-B, ¶ 28 (defense counsel's strategic decision not to seek severance was not unreasonable and did not constitute ineffective assistance). This is particularly true given that defendants had a combined trial before a single jury. Moreover, the jury was given only one option as to both defendants—first degree murder—and, though the jury was instructed on accountability, it was not a separate charge as to either defendant. Accordingly, Massey's counsel was not ineffective for failing to seek severance.

¶ 31        Nor is our analysis affected by the fact that, after trial, Massey's counsel filed a posttrial motion arguing that the trials should have been severed. The fact that counsel's strategy did not prove successful, or that counsel might have chosen a different strategy in hindsight, does not

render a strategy constitutionally ineffective. As this court has explained, "[I]n all ineffective assistance of counsel claims, the defense strategies presumed sound did not work. The strategies must be shown to be more than unsuccessful to overcome a presumption of soundness." *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997).

¶ 32    Massey next argues that his counsel should have objected to admission of incriminating hearsay statements from Ealy, namely, Ealy's conversation with Boyd (where he asked Boyd if he was from "over here") and his statement that it was "man down." But, as discussed, these statements do not implicate Massey, and they are actually helpful to Massey insofar as they make Ealy seem more likely to be the shooter. Thus, we find no strategic error in choosing not to object to these statements. It is undisputed that both men were at the scene; whether Massey was tried alone or with Ealy, the jury would have heard that evidence. At most, Massey would have been able to keep out Ealy's statements, but how would that help him? He would have wanted them in if he was tried alone because they clearly implicated Ealy and not him. Also, if defendants were tried separately, the State would likely have charged them both as principals and as accomplices and because the evidence that one of them shot Boyd was so strong, Massey's counsel could reasonably have concluded that his client had a better chance of a favorable verdict if the only charge he faced was first degree murder.

¶ 33    Third, Massey claims that his counsel should have argued in closing that Ealy was the sole shooter and that Massey was not accountable for Ealy's actions. But it is well established that a choice of defense theory is a strategic decision to which we show great deference. *People v. James*, 2017 IL App (1st) 143391, ¶ 154 (defendant could not state a colorable claim of ineffective assistance based on claimed errors in defense counsel's closing argument). Here, Massey's counsel chose to challenge the credibility of the State's eyewitnesses, arguing that they

were "telling the police nonsense" in order to avoid criminal charges. If counsel also argued that Ealy shot Boyd, he would have undermined his own strategy since all the witnesses who placed Ealy at the scene also placed Massey at the scene. The jury could have perceived him as conceding the credibility of the State's witnesses, which would have implicated Massey as well. Accordingly, despite the fact that the strategy adopted by Massey's counsel was ultimately unsuccessful, we do not find it so objectively unreasonable as to constitute ineffective assistance.

¶ 34    Finally, Massey argues that his counsel should have objected to certain statements made by Ealy's counsel during closing argument. Specifically, Ealy's counsel said, "Not one single witness took that stand and said Courtney Ealy shot a weapon. *** [T]here's no testimony *** that Courtney Ealy ever shot a gun." But this accurately reflects the trial testimony: although Johns admitted telling detectives that Ealy was the shooter, she testified at trial that she did not see the actual gun.[2] Herbert and Browns also denied seeing the shooter in their trial testimony. Thus, any objection would have been futile. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 95 (defense counsel is not required to make futile objections to provide effective assistance).

¶ 35                    Brown's Statements Regarding Massey's Clothing

¶ 36    Massey next argues that the trial court erred in allowing Detective John Halloran to testify that Brown said Massey was wearing an orange-and-black outfit at the time of the murder.

¶ 37    The relevant testimony is as follows. A week after the shooting, on March 1, 2014, Chicago police officers spoke with Brown at the Area Central police station. Brown testified that the officers took her phone but did not ask for consent to search it. She denied that the officers

_____

[2]Specifically, in response to the prosecutor's question, "[W]hat did you tell the detectives you identified [Ealy] as doing?" Johns responded, "He shot the dude." In context, Johns was clearly describing her prior statement at the police station. But when describing the actual shooting, she testified, "I didn't see a gun."

recovered any photos from her phone. She admitted signing a consent-to-search form but added, "[T]hey didn't tell me I was signing no form to search my phone."

¶ 38    In response, the State called Halloran, who testified that he spoke with Brown at Area Central. Brown was cooperative and told Halloran that, on her phone, she had photos of Massey and Ealy wearing the same outfits they wore at the time of the shooting. Halloran presented Brown with a consent-to-search form, which she signed, giving the officers permission to retrieve the photos from her phone. The State then showed those photos to the jury, including a photo of Massey "wearing the orange and black striped matching outfit that [Brown] indicated he was wearing at the time of the murder and that [officers] recovered from her phone."

¶ 39    Massey makes no argument regarding the photos themselves but argues that it was error to allow Halloran to testify to what Brown said about Massey's clothes. Massey admits he has forfeited this issue because he did not object to this testimony at trial or in his posttrial motion (*People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010)), but he argues we may still consider it under the plain error doctrine, which allows us to review "clear and obvious" unpreserved errors when either (i) the evidence is so closely balanced that the error threatened to tip the scales against the defendant or (ii) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Here, Massey argues that the first prong of plain error applies because the evidence regarding his presence at the scene of the shooting was closely balanced.

¶ 40    We disagree that the evidence was closely balanced. As Massey concedes elsewhere in his briefs, "the trial evidence overwhelmingly established [Massey's] presence at the scene." Three witnesses placed him at the scene, and their statements were consistent with each other and with the surveillance video. Moreover, Brown and Johns both testified to Massey's orange-

and-black striped outfit on the night of the murder, as did Herbert in her prior statement to police. Thus, even if Halloran's statements were admitted in error, Massey has not demonstrated any resulting prejudice. See *People v. Magallanes*, 409 Ill. App. 3d 720, 727 (2011) (in first-prong plain error analysis, defendant bears burden of showing the error was prejudicial).

¶ 41                                                       Mistrial

¶ 42        Massey next argues that the trial court erred by not declaring a mistrial based upon an outburst by the victim's family in the courtroom. We review the trial court's denial of Massey's motion for mistrial for an abuse of discretion (*People v. Bishop*, 218 Ill. 2d 232, 251 (2006)), keeping in mind that, by virtue of his presence in the courtroom, the trial judge is in a superior position to gauge the effect of an in-court occurrence on the jury. *People v. Howard*, 147 Ill. 2d 103, 145 (1991); *People v. Randall*, 363 Ill. App. 3d 1124, 1130-31 (2006). A court will not be found to have abused its discretion unless its decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 125.

¶ 43        When the State played the surveillance footage of the shooting, the victim's family "ran out" of the courtroom while making "an audible outburst." The trial court ordered a recess, and the jury was escorted from the courtroom. Outside the presence of the jury, the victim witness assistant for the State's Attorney's office informed the court that the family had previously viewed the video and their outburst was unexpected. The court then barred the family from the courtroom. Both defendants moved for a mistrial, which the court denied, stating, "Every time a victim's family member [cries] in the courtroom, there would be a mistrial." The court then brought the jury back into the courtroom and gave the following admonishment:

"Ladies and gentlemen, we had that little outburst. Now that's not evidence, and I'm going to instruct you that you have to disregard that little walking out of the courtroom. It has no impact whatsoever *** on this trial, whatsoever. I'm going to ask you, and I have a lot of faith in you, and you've been very attentive all this morning and this afternoon. Is there anybody that feels just because of that incident that we've seen here a couple minutes ago, that they could not give either Mr. Courtney Ealy or Mr. Massey a fair trial, please raise your hand.

(No response.)

Let the record reflect that nobody has raised their hand. So, again, totally disregard that. That wasn't—that's something we can't control. That was not evidence."

¶ 44    We do not find the trial judge abused his discretion in refusing to grant Massey's request for a mistrial. The outburst was an isolated incident in a trial that lasted three days. The experienced trial judge promptly admonished the jury to disregard the incident, and there is no evidence that the jurors were unable to follow the judge's instruction, particularly since none of them indicated as much in response to the judge's query. See *People v. Glasper*, 234 Ill. 2d 173, 201 (2009) (jury is presumed to follow the court's instructions). Moreover, the trial judge, having personally seen the outburst and assessed its impact on the jury, did not find a mistrial necessary.

¶ 45    Massey nevertheless argues that the prejudice from this incident was exacerbated by the prosecution's closing argument, which was "calculated to evoke sympathy from the jury." Specifically, the State argued that, when Boyd took the taxi call, he had no way of knowing it would be the last drive of his life; he was simply "doing his job" and "minding his business"; his story was "still being written" since the jury still had to decide defendants' guilt or innocence;

and though Boyd died alone in his car, "[t]oday, he is not alone. He has twelve of you who are going to give him justice."

¶ 46     Notably, Massey does not argue that any of these arguments were improper, much less present any authority to support that proposition. Accordingly, any such argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Nor do we see any connection between the complained-of arguments and the earlier incident, since the State made no mention of Boyd's family or their outburst, and the family was not present during closing arguments, having been banned from the courtroom. Accordingly, we find no error in the trial court's decision to deny Massey's motion for a mistrial.

¶ 47                              Declaring Johns a Material Witness

¶ 48     Finally, Massey argues that the trial court committed reversible error when it failed to give him notice before declaring Johns a material witness. The State argues that this issue is better decided in a postconviction petition because it involves matters outside the record and, in any case, Massey was not prejudiced by the alleged lack of notice.

¶ 49     The record reflects that the State had considerable difficulty securing Johns's appearance for trial. From August to November 2015, investigators made 15 unsuccessful attempts to locate and serve her, as well as various attempts to contact her associates and locate her work address. Additionally, because Johns had an outstanding warrant for her arrest in Indiana, investigators sought assistance from the U.S. Marshals Service Great Lakes Regional Fugitive Task Force. Nevertheless, by February 1, 2016, Johns still had not been located.

¶ 50     The case proceeded to trial on March 4, 2016, and Johns testified on March 8. The record is silent as to what transpired between February 1 and March 4, but Massey urges us to take

judicial notice of *People v. Johns*, 2016 IL App (1st) 160480, which describes some of the relevant events:

> "On February 9, 2016, Johns was taken into custody on a warrant in an unrelated Cook County traffic matter. At a hearing held on February 10, the traffic matter was disposed after a guilty plea with a sentence of time served. But Johns also had an outstanding warrant on a criminal charge pending in Lake County, Indiana, and therefore, the court ordered her held without bail. For reasons unexplained in the record, since February 10, no one from Indiana law enforcement has retrieved Johns from the Cook County jail. On February 16, 2016, while she remained in custody on the Indiana warrant, the State served Johns with a trial subpoena commanding her appearance on March 4." *Id.* ¶ 4.

¶ 51  On February 18, the State moved to declare Johns a material witness. At a hearing held the same day, the trial court, per Judge Diane Cannon, granted the State's motion and ordered Johns held without bail because of its concern that Indiana officials might take her before the court date. *Id.* ¶ 7. In a footnote, we observed that the record did not contain notice of the hearing to Massey and Ealy's counsel, nor did their counsel appear at the hearing. *Id.* ¶ 5 n.1.

¶ 52  Johns filed an emergency motion for this court to review the no-bail order. In a decision issued on March 4, we held that the trial court erred by entering a no-bail order without first giving Johns an opportunity to sign a written undertaking to appear at trial, as required by statute. *Id.* ¶ 18. We therefore vacated that portion of the court's order directing that she be held without bond and directed the court to (i) allow Johns the opportunity to sign a written undertaking to appear and (ii) determine what bond should be set. *Id.*

¶ 53     As noted, the record is silent as to what transpired on remand, but Johns testified on March 8. The prosecutor asked her, "[Y]ou are in custody today because you're in direct contempt of court on this case, correct?" She responded, "Yes." (The record does not reflect when Johns was held in contempt of court or for what.) After Johns testified and the jury was excused, the prosecution withdrew her status as a material witness. Johns's counsel then informed the court that Johns wished to purge herself of her contempt. Johns told the court, "I apologize for how I reacted. I was just mad. I was irritated that I wasn't able to explain what was going on with me." The court accepted her apology and declared her contempt purged. During closing arguments, the prosecutor asserted to the jury that Johns was in custody because she "decided that she would rather not come to court and be in contempt of court" than implicate Massey and Ealy in the shooting.

¶ 54     Massey argues that (i) the trial court erred by declaring Johns a material witness without giving him proper notice (see *People v. McDonald*, 322 Ill. App. 3d 244, 247-48 (2001) (failure to give defendant notice of material witness bond hearing was "clear error" but harmless under the circumstances)); (ii) the State, perhaps unintentionally, misrepresented the circumstances of Johns's detention in its closing argument; and (iii) Massey was prejudiced because, having been absent at the material witness bond hearing, he was unaware of the circumstances of Johns's detention and therefore could not challenge the State's argument.

¶ 55     The State contends that Massey's argument relies on matters outside the record, making it inappropriate for direct review and better addressed in a postconviction petition. We agree. See *People v. Newbolds*, 364 Ill. App. 3d 672, 676 (2006) (because reviewing court may not consider matters not of record, a claim that relies on evidence outside the record is not cognizable on direct appeal); *cf. People v. Ligon*, 239 Ill. 2d 94, 105 (2010) (where record is insufficiently

developed to assess counsel's effectiveness, an ineffective assistance claim should be brought on collateral review instead of on direct appeal). Although we may take judicial notice of the events described in *Johns*, 2016 IL App (1st) 160480, there are many questions that remain unanswered. What happened between March 4, when we remanded the cause in *Johns*, and March 8, when Johns appeared for trial? Apparently, Johns was found to be in contempt of court, but when and why? Was the contempt finding related to her material witness designation? To what extent was Massey's counsel aware of the proceedings involving Johns? Notably, Massey's counsel never expressed any surprise or requested any explanation regarding Johns being a material witness and in custody, although these matters were discussed in his presence.

¶ 56      For these reasons, Massey's claim of error is more appropriately addressed in a postconviction proceeding. We therefore decline to address the merits of this issue.

¶ 57                                    CONCLUSION

¶ 58      Because (i) Massey's counsel was not constitutionally ineffective, (ii) Massey suffered no prejudice from alleged hearsay testimony about his clothing on the night of the murder since other evidence overwhelmingly established his presence at the scene of the crime, and (iii) the trial court did not abuse its discretion in denying a mistrial based on an outburst by the victim's family, we affirm the judgment of the trial court.

¶ 59      Affirmed.