2023 IL App (1st) 220123

SIXTH DIVISION
December 15, 2023

No. 1-22-0123

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 6853 |
| CLINT MASSEY, | ) ) | The Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.

Justices C.A. Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Clint Massey, age 17,[1] and codefendant Courtney Ealy were both convicted of first degree murder in connection with the shooting death of a taxi driver, Javan Boyd, on the night of February 21, 2014. In addition, the jury found that the State had proven beyond a reasonable doubt that defendant, or one for whose conduct defendant was legally responsible, was armed with a firearm during the commission of the offense. However, the jury did not find this allegation was proven beyond a reasonable doubt with respect to Ealy.

_____

[1]This was defendant's age at the time of the offense.

¶ 2    Since defendant was 17 years old at the time of the offense, the trial court had the discretion to impose or not impose the sentencing enhancement. The trial court sentenced defendant to 24 years, plus a 15-year firearm sentencing enhancement, for a total of 39 years with the Illinois Department of Corrections (IDOC). Defendant's conviction was affirmed on appeal by this court on June 4, 2019.

¶ 3    In the present appeal, defendant challenges the dismissal of his attorney-drafted postconviction petition as frivolous and patently without merit. Defendant, who continues to be represented by an attorney, raises four claims on appeal: (1) actual innocence, supported by the affidavit of an eyewitness, Anton Kinermon, (2) prosecutorial misconduct, on the ground that a witness's recantation at trial demonstrates that prosecutors must have fabricated her pretrial statement, (3) a *Brady* violation (see *Brady v. Maryland*, 373 U.S. 83 (1963)), on the ground that prosecutors allegedly concealed an alleged deal with a trial witness, and (4) ineffective assistance of counsel, on the ground that trial counsel allegedly failed to investigate alibi witnesses. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    On direct appeal, this court summarized the facts established by the State's evidence at trial, as follows:

"On the night of February 21, 2014, defendant[ ] [and Ealy] attended a party at 39th Street and Wentworth Avenue, in the Wentworth Gardens housing project. [Defendant] wore a tiger-striped jogging suit, and Ealy wore a Burberry shirt and white pants. Also attending the party were Kaprice Johns, Jasmine Brown, Germontay Carpenter, T'Keyah Herbert, and Jerome Anderson.

[Defendant and Ealy] left the party with Herbert in Herbert's van. After they left, Johns, who remained at the party, got into an argument with a group of women known as 'Pretty in Pink' because Johns disliked the song that was being played. As they argued, someone fired a gun into the air multiple times. Johns did not see who fired the shots, but she guessed that the shooter wanted to stop the argument because it was too loud. The gunshots did not hit anyone.

After the altercation, Johns left the party with Brown, Carpenter, and Anderson. They left in Johns's car, with Anderson driving. Carpenter made a phone call to either [defendant] or Ealy, who were still with Herbert in her van, and told them about the altercation at the party. Carpenter put the call on speakerphone, and Brown could hear Ealy's voice, which she recognized, on the other end.

Anderson drove to Wendy's, where they met up with a red car and Herbert's van. Ealy and [defendant] exited the van and got into the red car, along with a man named D-Rose. (A fourth man, unidentified at trial, was the driver.) The three vehicles drove back toward Wentworth Gardens in a convoy: first the red car, then Herbert's van, then Johns's car. According to Johns, they intended to 'see who shot at [them]' and 'deal with the matter.'

Meanwhile, Latoya Adams was visiting her mother in Wentworth Gardens. Around 3 a.m. on the morning of February 22, she called for a taxi to go to a friend's house. Boyd, who was driving a car that contained no outside indication that it was a vehicle for hire, was dispatched to the call.

As the three-vehicle convoy approached 38th Street and Princeton Avenue, they passed Boyd sitting in his parked car, waiting to pick up Adams. The three vehicles all

3

made a U-turn and came to a stop. [Defendant], Ealy, and D-Rose exited the red car and approached Boyd's car from the passenger side.

Both Herbert and Johns witnessed the shooting. Herbert saw [defendant] and Ealy open Boyd's passenger-side door and then saw [defendant] firing a gun into the car. She heard four or five gunshots, after which [defendant] and Ealy returned to the red car and drove away.

According to Johns, [defendant] and Ealy spoke to Boyd, and then Johns saw 'a light flash from the gun' and Boyd 'jumping' as if he was getting shot. At trial, Johns said she did not see the actual gun, but in a prior statement to detectives, Johns identified Ealy as the shooter. After the shooting, D-Rose ran back to Johns's car and got inside, saying 'shit' and 'he's dead.' [Defendant] and Ealy ran back to one of the other vehicles, and all three vehicles drove away. As they left, Johns could see Boyd 'slumped over' in his car.

The shooting was captured on surveillance cameras belonging to the Chicago Housing Authority, which owns the Wentworth Gardens housing project. The video footage was played for the jury. In the videos, three vehicles drove past Boyd's vehicle and then drove back the other way. The convoy leader, a red car, stopped next to Boyd's vehicle and two men got out, one wearing a striped track suit ([defendant]) and the other wearing a brown shirt and white pants (Ealy). They approached Boyd's car from the front passenger side and appeared to be talking to him. Boyd's car started backing up but hit a vehicle parked a couple of feet behind him. (At this point, D-Rose got out of the red car and ran back toward Johns's car.) There was a bright flash of light near Ealy's hand; Boyd's car surged forward and hit another parked car. [Defendant] and

4

Ealy ran forward to look in the front passenger window. Ealy returned to the red car, [defendant] followed him a few moments later, and the three vehicles drove away." *People v. Massey*, 2019 IL App (1st) 162407, ¶¶ 4-12.

¶ 6    After driving away, all three vehicles drove to a Shell gas station at 55th Street. Video footage from the gas station showed Ealy walking toward Johns's car, but defendant did not appear on the video. A fingerprint belonging to Ealy was recovered from Boyd's passenger-side window. A firearms examiner determined that all the bullets recovered from the scene and from the autopsy were fired from one gun and that all the cartridges recovered from the scene were fired from one gun. However, the examiner said that it was impossible, as a general matter, to determine whether cartridges and bullets were fired from the same gun. *Massey*, 2019 IL App (1st) 162407, ¶¶ 14-16.

¶ 7    A single jury found both defendant and Ealy guilty of first degree murder but found the firearm allegation proven only with respect to defendant. After a sentencing hearing, the trial court imposed a 39-year total sentence on defendant. *Massey*, 2019 IL App (1st) 162407, ¶ 20. On appeal, defendant argued, first, that his trial counsel was ineffective for failing to more vigorously pursue a theory that Ealy was the sole shooter. *Massey*, 2019 IL App (1st) 162407, ¶ 22. Second, defendant argued that the trial court erred in allowing Detective Halloran to testify, after Jasmine Brown denied that officers recovered photos from her phone. Halloran testified (1) that Brown told him that she had pictures on her phone showing defendant and Ealy wearing the same outfits that they had worn at the time of the shooting and (2) that Brown gave him the phone and signed a consent-to-search form. The State showed the jury these photos, including a photo of defendant wearing the orange-and-black-striped matching outfit that Brown had indicated defendant was wearing at the time of the shooting. *Massey*, 2019 IL

App (1st) 162407, ¶¶ 22, 38. Third, defendant argued that the trial court erred by not declaring a mistrial after an outburst from the victim's family. *Massey*, 2019 IL App (1st) 162407, ¶ 22. Lastly, defendant argued that the trial court committed reversible error when it failed to give him notice prior to the hearing at which Johns was declared a material witness. *Massey*, 2019 IL App (1st) 162407, ¶ 22. After considering these claims, this court affirmed defendant's conviction on appeal. *Massey*, 2019 IL App (1st) 162407, ¶ 56.

¶ 8      On October 12, 2021, defendant filed an attorney-drafted postconviction petition. Attached to the petition was the typed, sworn and notarized[2] affidavit of Anton Kinermon,[3] which stated, in full:[4]

"(1) I have material information relevant to the above specified case;

(2) On February 22, 2014 at about the early morning hours, on 37th Princeton, in Chicago, Illinois, I was walking past a gold 4 door car with a man in it when a car full of people followed closely by a white van and another car drove by the gold car and all 3 cars u-turned to return to the gold car;

(3) I saw a man I know as Marks Alonzo Watkins, see attached photo), exit the passenger door of the white van with a handgun, walk up to the gold car and fired shots in the gold car at Javan Boyd;

---

[2]The affidavit was notarized by defendant's attorney who also represents him on this appeal.

[3]In the attached affidavit, the affiant's last name is typed as "Kinermon." However, the trial court's order spelled the last name as "Kinerman." Defendant spelled the affiant's last name as "Kinerman" in his initial brief to this court, but as "Kinermon" in his reply brief. The State's brief spelled the last name as "Kinermon." Relying on the typed version of the last name in the sworn affidavit, we spell the last name as "Kinermon."

[4]The various typos are in the original.

(4) When the gun man walked back to the white van, he looked directly at me and hollered loudly the following words; quote, 'if either of you or anyone else tell about this murder, me and my gang will hunt you down and shoot each of you in the head;

(5) I ran away and was afraid to come forward until January 26, 2020 when I noticed posters (See, attached exh 'A', Notice)[5] on doors on 37th and Princeton, seeking information about the murder and assuring me that I would be safe;

(6) If called upon, I will appear and testify to the truth of the statement."

The petition also attached alibi affidavits from (1) Shehina Sherri Jones, (2) Doranna D. Jones, and (3) Cleo King. The affiants swore that defendant was at home, with them, during the relevant time period and that an investigator, who worked on behalf of defendant's trial counsel, interviewed them prior to trial.

¶ 9    On December 22, 2021, in a 17-page typewritten order, the trial court dismissed the postconviction petition as frivolous and patently without merit. The judge was the same judge who had presided over defendant's original jury trial. With respect to defendant's actual innocence claim, the trial court found that the three alibi witnesses were not newly discovered, since they all averred that they had previously spoken with defense counsel's investigator prior to trial. In addition, the court found that the information in their affidavits, as well as Kinermon's affidavit, would probably not change the result at trial, where "three witnesses placed [defendant] at the scene and there was surveillance video of the crime which depicted a person the witnesses identified as [defendant] by his outfit." Thus, the trial court found this claim frivolous and patently without merit.

---

[5]Neither the photo of the alleged shooter nor the poster is attached.

7

¶ 10    With respect to defendant's claim of prosecutorial misconduct, the trial court found "baseless" defendant's claim that prosecutors had fabricated a pretrial statement on behalf of T'Keyah Herbert:

> "Defendant has provided no concrete evidence this occurred absent a portion of the transcript of Herbert's trial testimony where she denies making some statements in the official statement. However, she acknowledge[d] her signature, which is on all five pages of the statement. [Citation.] Therefore, while [defendant] believes Herbert's testimony at trial constitutes definitive evidence [that Detectives] Waller and Garza fabricated this statement, her testimony is in direct conflict with her signed statements in which she acknowledges those were her words."

¶ 11    With respect to the alleged *Brady* violation, defendant claimed that Kaprice Johns, a trial witness, had an outstanding warrant in Lake County, Indiana, and that the State had the alleged warrant quashed in order to get her to testify against defendant. The trial court found that "there is no indication Johns was being offered any type of deal in order for her" to testify. The trial court found that defendant had failed to present "any evidence of an agreement between Lake County and the State in this case that Johns' warrant was quashed as part of a deal to get her to testify against" defendant. The court found that defendant had failed to attach any supporting evidence to his petition and failed to include adequate facts, other than simply asserting that a violation had occurred.

¶ 12    With respect to the ineffective assistance claim regarding the alibi witnesses, the trial court observed that all three affiants were known to trial counsel, per their own sworn statements, and "counsel's strategic decisions will not be second-guessed."[6]

¶ 13    After the trial court dismissed the petition as frivolous and patently without merit on December 22, 2021, counsel filed a timely notice of appeal on January 19, 2022. This appeal followed.

¶ 14                                II. ANALYSIS

¶ 15    Defendant challenges the dismissal of his attorney-drafted postconviction petition as frivolous and patently without merit. On this appeal, defendant, who is still represented by an attorney, alleges (1) his actual innocence, as evidenced by the affidavit of an eyewitness, Anton Kinermon, (2) prosecutorial misconduct, as evidenced by a witness's recantation at trial that allegedly demonstrates that prosecutors must have fabricated her pretrial statement,[7] (3) a *Brady* violation, where prosecutors allegedly concealed an alleged deal with a trial witness, and (4) ineffective assistance of counsel, where trial counsel allegedly failed to investigate alibi witnesses. For the following reasons, we affirm.

¶ 16                          A. Postconviction Petition

¶ 17    Defendant seeks relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The Act provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. It is not a substitute for appeal but, rather, a collateral proceeding that attacks a final judgment.

---

[6]Two additional claims made in the petition are not raised on appeal: (1) that his arrest was pursuant to an unconstitutional investigative alert and (2) that his 39-year sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012).
    [7]"[R]ecantation testimony is regarded as inherently unreliable." *People v. Sanders*, 2016 IL 118123, ¶ 33.

¶ 18 The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2020); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 19 At the second stage, counsel is appointed if a defendant is indigent and unrepresented by counsel. 725 ILCS 5/122-4 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 20 If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the trial court acts as fact finder, determining witness credibility and the weight to be given particular testimony and evidence and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 21 As noted above, a petition may be dismissed at the first stage only if it is frivolous or patently meritless. *Domagala*, 2013 IL 113688, ¶ 32. While patently meritless is a low standard, it does not excuse a defendant from providing factual support for his claims. *People v. Allen*, 2015 IL 113135, ¶ 24. A defendant must supply a sufficient factual basis to show that the allegations in his petition are capable of objective or independent corroboration. *Allen*, 2015 IL 113135, ¶ 24.

¶ 22 B. Standard of Review

¶ 23    When no evidentiary hearing is held, as in the case at bar, a reviewing court's standard of review is *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 24    The Act specifically requires the petitioner to attach to his petition "affidavits, records or other evidence supporting the petition's allegations or state why the same are not attached." *Sanders*, 2016 IL 118123, ¶ 45 (citing 725 ILCS 5/122-2 (West 2014)). The court must accept as true both the petition's allegations and its supporting evidence "unless they are positively rebutted by the record of the original trial proceedings." *Sanders*, 2016 IL 118123, ¶ 48. By the record, the Act means " 'the court file of the proceeding *** and any transcripts of such proceeding. ' " *Sanders*, 2016 IL 118123, ¶ 43 (quoting 725 ILCS 5/122-2.1(c) (West 2014)); see also *People v. Robinson*, 2020 IL 123849, ¶ 45 ("the trial record"). " 'At the first stage of postconviction [proceedings] there are no hearings, no arguments, and no introduction of evidence.' " *People v. Savage*, 2020 IL App (1st) 173135, ¶ 48 (quoting *People v. Johnson*, 2018 IL 122227, ¶ 21.

¶ 25                                    C. Actual Innocence

¶ 26    The evidence supporting an actual-innocence claim must be (1) new, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *Allen*, 2015 IL 113135, ¶ 22; *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. "Material means the evidence is relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. To be material, the evidence "need not, standing alone, exonerate the defendant; rather, it must tend

to 'significantly advance' his claim of actual innocence." *People v. Stoecker*, 2014 IL 115756, ¶ 33. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. Conclusive means that the additional evidence, "when considered along with the trial evidence, would probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key ***." *Coleman*, 2013 IL 113307, ¶ 97. A piece of new evidence is conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence also presented by the petitioner. *Sanders*, 2016 IL 118123, ¶ 53; see *Coleman*, 2013 IL 113307, ¶¶ 104-08 (considering together the statements of all the new witnesses presented by defendant).[8]

¶ 27       It is presumed at this initial stage that the new evidence will contradict the evidence of defendant's guilt at trial; otherwise, "the purpose of the Act would be rendered meaningless." *Robinson*, 2020 IL 123849, ¶ 57. "For new evidence to be positively rebutted" at this early stage, "it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where" the trial record "affirmatively and incontestably demonstrate[s]" the new evidence "to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. As an example of what would rise to the level of false or impossible, the supreme court cited a case where the new evidence asserted that the victim had been shot only once, but the autopsy evidence at trial established that he had been shot multiple times. *Robinson*, 2020 IL 123849, ¶ 59 (discussing *Sanders*, 2016 IL 118123).

¶ 28       Although defendant attached other affidavits to his petition in support of his actual innocence claim, he argues on appeal only that the Kinermon affidavit was overlooked by the

---

[8]Our supreme court has "specifically rejected the total vindication or exoneration standard" set forth in *People v. Savory*, 309 Ill. App. 3d 408, 415 (1999). *Robinson,* 2020 IL 123849, ¶ 55 (citing *People v. Savory*, 197 Ill. 2d 203, 213 (2001) (specifically rejecting the "complete vindication" standard set forth in the lower court's opinion)).

trial court. Thus, we consider only this affidavit on appeal with respect to his actual innocence claim. Points not argued are waived. *People v. Cardona*, 2013 IL 114076, ¶ 19; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 29                                    D. Of a Conclusive Character

¶ 30            "[C]onclusiveness of the new evidence is the most important element of an actual innocence claim." *Sanders*, 2016 IL 118123, ¶ 47. "We need not address whether petitioner's new evidence could have been discovered earlier in the exercise of due diligence" or "whether it is material and not merely cumulative" if "we conclude that, even assuming these conditions have been satisfied, the evidence is not of such conclusive character that it would probably change the result on retrial." *Sanders*, 2016 IL 118123, ¶ 47. "We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47. In the case at bar, the trial court found that none of the affidavits submitted by defendant, including the Kinermon affidavit at issue on appeal, was so conclusive as to change the result at a retrial, since they were affirmatively rebutted by surveillance video and witness testimony. After watching the short videos in People's exhibit No. 10 numerous times, we must agree that the videos affirmatively rebut the statements in the Kinermon affidavit, similar to the way an autopsy report would. See *supra* ¶ 27.

¶ 31            People's exhibit No. 10 contains two videos. The video labeled "3739"—for 3739 Princeton Avenue—shows the victim's gold[9] car arriving at 3:36 a.m. and stopping in the

---

[9]Although the victim's car was apparently beige, it appears gold under the night-time street lighting in the videos. (Officer Ramon Melendez, who arrived on the scene after the shooting, testified that the victim's car was "beige.") However, since we are describing the videos, we state here how the car appears in the videos, which is also how it is described in Kinermon's affidavit.

middle of the street. Two minutes later, at 3:38 a.m., the gold car pulls into a spot to allow the three-vehicle caravan to pass. After pulling into the spot, the driver's side of the gold car is closer to the sidewalk, and the passenger's side is closer to the street. When first seen on the video, the three vehicles are driving toward the front of the gold car, which pulls into a spot, and they drive past. The video shows that, at 3:39 a.m., the red car returns and stops in the street, in front of and to the right of the gold car. Although the red car must have made a U-turn in order to return, the U-turn is not shown on the video. The video shows two people exiting the stopped red car: one exits from the rear door closest to the gold car, and the other emerges from the other side of the red car. Both people go up to the passenger side of the gold car. Then the gold car backs up and hits an unrelated van parked in back of it. At that moment, the video shows a third person exiting the red car and running back, off screen. The gold car then lurches forward and hits the car parked directly in front of it. At 3:40 a.m., the white van drives up and stops. No one exits from it. The dark car approaches and all three vehicles—the red car, the white van, and the dark car—drive off. Other than the three people who exit the red car, the video shows the scene vacant of people. On the near side of the street is a clear sidewalk; on the far side of the street is a row of parked cars next to a snow drift.

¶ 32       A second video labeled "3723"—for 3723 Princeton Avenue—shows (1) the gold car driving down the street and vanishing off the left side of the screen, (2) the three-vehicle caravan driving in the opposite direction and vanishing off the right side of the screen, and (3) the three-vehicle caravan driving back, now driving in the same direction that the gold car went, and vanishing off the left side of the screen. The second video shows that the far side of the street is covered in a snow drift, where it meets the street, and that the near side of the street has a shoveled sidewalk. No people are visible in the video.

14

¶ 33   The first paragraph of Kinermon's affidavit states that, on February 22, 2022, "in the early morning hours," by 37th Street and Princeton Avenue, "he was walking past a gold 4 door car with a man in it when a car full of people followed closely by a white van and another car drove by the gold car and all three cars u-turned to return to the gold car." The date, time, and place averred by Kinermon are the exact date, time, and place of the murder. However, at no point in the video at the time of the shooting is Kinermon visible. Nevertheless, giving appellant the benefit of the doubt, his use of the word "walking" establishes that he was on foot and moving, rather than in one of the parked cars along the street. Thus, it is possible that Kinermon walked past the gold car as the car was driving down the street off-camera—in other words, before the car stopped in the middle of the street. It is also possible that, from a distance and not shown on the videos, he watched the three-vehicle caravan pass the gold car. The U-turn is not depicted on either video, so it is possible that Kinermon was near where the U-turn occurred.

¶ 34   The second paragraph in Kinermon's affidavit states that he saw a man that he knew "exit the passenger door of the white van with a handgun, walk up to the gold car and fire[ ] shots in the gold car at Javan Boyd," the victim. At the time of the shooting, the white van is off camera. Thus, it is possible that a man could have exited the white van without being depicted on the video.

¶ 35   However, this is where the affidavit is affirmatively and incontestably in conflict with the trial record. The affidavit swears that this person, who exited the white van, walked up to the gold car and started shooting. But the video depicts the actual shooting, and the only people who walked up to the victim's car were the two people who exited the parked red car. Realizing, as he must, that there is a big problem with the affidavit, defendant argues in his

reply brief that "the fact that Kinermon's affidavit does not map exactly with the video is irrelevant" because stress, weapon focus, and brevity of observation time can negatively impact a witness's recall. In other words, defendant is arguing against the accuracy of the very affidavit that he is putting forth as conclusive evidence.

¶ 36 In his reply brief, defendant further argues that the third person who exited the red car and ran in the direction of the white van was "likely" the person who shouted a threat to Kinermon. However, Kinermon's affidavit avers that the person who shouted the threat was "the gun man." In Kinermon's affidavit, the shooter and the threatening person are one and the same. But the video shows that this third person who exited the red car ran away from the victim's car and was not the shooter. Thus, even if one accepts defendant's argument on appeal that the person who threatened Kinermon was the third person who exited the red car and ran toward the white van, this argument positively rebuts the other—and key—part of Kinermon's affidavit—namely, that this person was the shooter.

¶ 37 As defendant seems to acknowledge in his reply brief, there is simply no way to align Kinermon's affidavit with the videos. If, in order to make it align, we must disregard a significant portion of it as faulty memory and factually wrong, then a claim that it is of such a conclusive character that it would probably change the result on retrial is patently without merit.

¶ 38 E. Other Claims

¶ 39 Defendant's remaining claims are easier to dispose of. Defendant's second claim is that a witness's recantation at trial demonstrates that prosecutors must have fabricated her prior statement. However, "recantation testimony is regarded as inherently unreliable" (*Sanders*, 2016 IL 118123, ¶ 33). As the trial court observed, the witness acknowledged her signature,

which is on all five pages of the statement. While defendant may believe that her testimony at trial constitutes definitive evidence that detectives fabricated her prior statement, her trial testimony is in direct conflict with her signed statements, in which she acknowledged those were her words.

¶ 40    Third, defendant alleges a *Brady* violation, where prosecutors allegedly concealed an alleged deal with Johns, a trial witness. However, as the trial court found, "there is no indication Johns was being offered any type of deal in order for her" to testify in this case. As the trial court noted, defendant failed to present "any evidence of an agreement between Lake County[, Indiana] and the State in this case that Johns' [Indiana] warrant was quashed as part of a deal to get her to testify against" defendant. The trial transcript shows that, after Johns testified in the case at bar, the trial court asked the assistant state's attorney (ASA), "Now, there's still a warrant?" The ASA responded, "She still has the matter in Indiana." The trial court then instructed the witness: "You still have to worry about that thing in Indiana. But, other than that, you're done with this." In his brief to this court, defendant asks for a hearing, so that he can subpoena undisclosed, unnamed "Indiana authorities" in order to discover an alleged deal with Johns. His request is, in essence, the first step of an open-ended quest and a concession of a lack of evidence.

¶ 41    Fourth, defendant alleges ineffective assistance of counsel, where trial counsel allegedly failed to investigate alibi witnesses. However, as the trial court observed, all three affiants were known to trial counsel, per their own sworn statements. All three alibi witnesses swore in their affidavits that an investigator, who worked on behalf of defendant's trial counsel, interviewed them prior to trial. In addition, before the defense rested, counsel stated that he wanted "to put on the record" that he had "talked to his client about other potential witnesses,"

and defendant understood, and agreed with, the decision to not put on any further evidence on his behalf. The trial court asked: "And that's a matter of trial strategy?" Counsel replied: "It is, Your Honor." The court then inquired if defendant was "good with" that, and defendant said yes. On review, we will not second guess counsel's trial strategy. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Ineffective assistance claims are "viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *Fuller*, 205 Ill. 2d at 331. Our supreme court has noted that "[c]ounsel's strategic choices are virtually unchallengeable." *Fuller*, 205 Ill. 2d at 331. Thus, we agree with the trial court that defendant's second, third, and fourth claims are also patently without merit.

¶ 42                                    III. CONCLUSION

¶ 43          For the reasons explained above, we find that defendant's actual innocence claim, based on the Kinermon affidavit, was properly dismissed as frivolous and patently without merit, where a significant portion of his affidavit is affirmatively rebutted by surveillance videos of the shooting. In addition, we find his remaining claims do not warrant extended discussion and are also patently without merit.

¶ 44          Affirmed.

*People v. Massey*, 2023 IL App (1st) 220123

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-6853; the Hon. Vincent M. Gaughan, Judge, presiding. |
| **Attorneys for Appellant:** | Larry Redmond, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Paul E. Wojcicki, and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |