2024 IL App (1st) 230150-U

No. 1-23-0150

Order filed September 26, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 9150 |
| | ) | |
| WILLIAM RAMOS, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OCASIO delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions are affirmed over his contention that counsel was ineffective for failing to properly support the theory of self-defense and for presenting two competing theories of defense, one of which undermined the other.

¶ 2    Following a bench trial, defendant William Ramos was found guilty of one count of armed violence (720 ILCS 5/33A-2(a) (West 2018)) and two counts of aggravated discharge of a firearm toward an occupied vehicle (720 ILCS 5/24-1.2(a)(2) (West 2018)) and sentenced to concurrent terms of 15, 9, and 9 years in prison, respectively. On appeal, Ramos contends that he received

ineffective assistance of trial counsel where counsel failed to properly support the theory of self-defense and "presented legally incorrect arguments that undermined self defense." For the reasons that follow, we affirm.

¶ 3    Ramos's convictions arose from the events of June 1, 2019, when he exchanged gunfire with a team of police officers who had a warrant for his arrest and had been conducting surveillance of a Melrose Park house associated with him. Following arrest, Ramos was charged by indictment with six counts of attempted first degree murder of a peace officer, one count of armed violence, six counts of aggravated discharge of a firearm toward a peace officer, two counts of aggravated discharge of a firearm toward an occupied vehicle, three counts of aggravated unlawful use of a weapon (AUUW), and one count of possession of a controlled substance.

¶ 4    In his answer to the State's motion for pretrial discovery, Ramos indicated that, at trial, he would be raising the affirmative defense of "Use of Force in Defense of Person." Also prior to trial, the State filed a motion *in limine* seeking to prohibit Ramos from introducing hearsay evidence of his own statements at trial, unless he were to testify himself. In court, the State explained that it was specifically seeking to prohibit testimony regarding a statement Ramos made to police officers at the scene. Defense counsel responded that Ramos was "planning on testifying" and that the court would "certainly" hear the statement at that time. As to hearsay, counsel suggested that Ramos's statement to the police was admissible as an excited utterance. The court deferred ruling on the motion at the time, stating that it would "see how the witnesses testify and what's going on."

¶ 5    In opening, the State asserted that the evidence would show that two members of the police surveillance team were attempting to execute a plan to apprehend Ramos when he fired into their

unmarked vehicle. Defense counsel asserted that when the two officers sped directly toward Ramos, he thought his life was in danger, in that the vehicle "was looking to hurt and/or kill him." At that point, according to counsel, Ramos "shoots twice to get the [vehicle] from coming at him." Counsel further stated that Ramos had been associated with gangs since he was 12 years old and lived his life in "survival mode" and in constant fear of someone trying to hurt him. Counsel argued, "Every morning waking up, he doesn't know if someone from another gang, from his gang, is going to be looking to hurt him, looking to kill him." As such, according to counsel, when Ramos saw a vehicle driving directly toward him, he believed his life was in danger. Counsel concluded with an argument that Ramos could not be found guilty where he was acting in self-defense and "discharged [a weapon] only in the defense of his well-being and his life."

¶ 6    The State's first witness was Melrose Park police investigator Leonard Bartemio, who testified that, on June 1, 2019, he was part of a team conducting surveillance for the execution of a search warrant of a house. The target of the warrant was Ramos, whom he identified in court. Bartemio estimated that he had known Ramos for about 15 years and had had "encounters" with him over 12 times.

¶ 7    On the day in question, Bartemio and his partner, Jose Velazquez, were in an unmarked gray Volvo SUV with tinted side windows, parked in a church parking lot across the street from the house. They were wearing vests with police markings on the front that he described as "reflector patches." About 6:50 p.m., a black vehicle with tinted windows pulled up, and Ramos exited the vehicle and walked into the house. Bartemio radioed the team and was told to "hold off until further." The black vehicle moved to a nearby parking area for a few minutes and then

returned to the front of the house. Ramos exited the house, locked the door, and began walking toward the black vehicle.

¶ 8 Bartemio backed out of the space where he was parked and drove toward Ramos. When asked about the manner in which he approached, Bartemio answered, "We just drove not to draw attention to us." Bartemio pulled up on the house's "drive parking pad." He described what happened next: "As we pulled up, the target was pretty much arm's-length to the hood car [*sic*]. He looked at us; he turned around, and he turned around again and started shooting." Bartemio specified that when Ramos "looked at us," they made eye contact. He did not know how many times Ramos shot at their Volvo.

¶ 9 As Bartemio ducked, Velazquez returned fire. Velazquez then exited the Volvo and chased Ramos on foot. Bartemio also exited the Volvo, which, because it was still in drive, rolled and hit two parked cars. Ramos was "taken down" several feet from the front of the Volvo.

¶ 10 On cross-examination, Bartemio confirmed that he did not identify himself as a police officer to Ramos and that nothing on the Volvo identified it as a police vehicle. However, he stated that Ramos "could see police reflecting" on his and Velazquez's vests. He agreed that, when Ramos exited the black vehicle, he seemed paranoid and was looking all over. He also agreed that the reason he pulled up onto the driveway was to cut off Ramos's escape route.

¶ 11 In response to questions posed by the court, Bartemio stated that none of the police vehicles at the scene had dashboard cameras and none of the officers present had body-worn cameras. He recalled that the team included 10 to 20 officers and several vehicles from multiple towns, but did not remember the exact numbers.

¶ 12    Melrose Park police detective Jose Velazquez testified that, on the day in question, he and Bartemio were in a Volvo with tinted windows, conducting surveillance of the house from the church parking lot across the street. Their aim was to execute an arrest warrant for Ramos, whom he identified in court.

¶ 13    Around 7 p.m., Velazquez observed a black vehicle pull up to the house. Ramos exited the vehicle and ran inside the house. When he came back out, Bartemio backed the Volvo out of their parking spot, drove toward the house, "slowed down and then *** pulled up right next to the driveway." Velazquez denied that they drove fast and described their approach as "controlled," as they were trying not to startle Ramos and cause him to run. Bartemio pulled up in front of Ramos, who was by the "parkway driveway place."

¶ 14    According to Velazquez, Ramos looked inside the Volvo. He testified, "I would say he saw me, because I saw his eyes look at me." Ramos slightly turned and, as he did so, he reached inside his waistband. He pulled out a gun, pointed it at the windshield, and fired one or two shots at Velazquez. Velazquez heard a "loud bang, explosion." He ducked, pulled his own weapon, and fired back approximately five times. He checked to make sure Bartemio had not been hit, exited the Volvo, and chased Ramos, who was running from the scene. Ramos ran "kind of like into a house" and then fell or tripped onto the grass. Other officers who had arrived on the scene and were assisting in placing Ramos in custody searched him and recovered a "bag of drugs" from his person.

¶ 15    On cross-examination, Velazquez agreed that when Ramos exited the house, the black vehicle, which had appeared to be waiting for him, started driving toward him. However, Velazquez "couldn't say" that Bartemio blocked the path of the black vehicle. He agreed that he

did not identify his office to Ramos. Velazquez did not hear Ramos say anything as he was being handcuffed. On redirect, he testified that it was difficult for him to hear at the time of arrest because his ears were ringing as a result of firing his weapon inside the Volvo.

¶ 16    In response to questions from the court, Velazquez clarified that he shot at Ramos through the Volvo's windshield, and that Ramos was four or five feet from him at the time of the shooting.

¶ 17    Melrose Park police lieutenant John Schillinger testified that his surveillance location was at the end of the block, approximately six or seven houses from the house in question, and that a church building blocked his view of the house. Around 6:15 p.m., he heard a radio transmission reporting that Ramos, whom he had seen "dozens" of times before and whom he identified in court, was walking into the house. He stated, "At that time, we were told to stand down because there was a vehicle that was still waiting that had dropped him off; waited to see if he came out of the residence." A few minutes later, he received another radio transmission reporting that Ramos had exited the house.

¶ 18    The driver of Schillinger's vehicle, Franklin Park police sergeant Ford, started driving toward the house.[1] About halfway there, Schillinger heard multiple gunshots and saw Ramos firing at a silver SUV. As Schillinger exited his vehicle, he announced his office, drew his own weapon, and ordered Ramos to "drop the gun." Ramos did not do so, so Schillinger discharged his firearm twice. After the second shot, Ramos spun, lost his balance, and fell to the ground. Schillinger and Velazquez thereafter handcuffed Ramos. Schillinger called for medical aid, as Ramos was bleeding from a gunshot wound to his upper left arm.

---

[1] The record does not reveal Sergeant Ford's first name.

¶ 19    On cross-examination, Schillinger acknowledged that he did not see the manner in which the Volvo SUV approached Ramos. He clarified that Ramos had already discharged his weapon and started running before Schillinger exited his vehicle and announced his office. He recalled that Ramos said something when he was being placed under arrest. In response to questions from the court, Schillinger stated that, after he discharged his own weapon, he did not know what happened to the gun Ramos had been firing. When he handcuffed Ramos, he searched his pockets and recovered suspected cocaine and some money. Ramos and Schillinger both left the scene in an ambulance.

¶ 20    Melrose Park police sergeant Pesce testified that he was in charge of the surveillance team, which consisted of eight officers in four unmarked vehicles, which were set up in different locations to execute a search warrant for Ramos.[2] Pesce and his partner, Investigator Pitassi, were stationed a block from the house.[3] Pesce could see the house and the front yard, but not the front door.

¶ 21    About 6:50 p.m., Pesce saw a black vehicle pull up to the house. Ramos, whom he identified in court, exited the vehicle and entered the house. Because the black vehicle was "hanging out in the area," Pesce instructed the team to wait for Ramos to come back outside. When he did, Pesce told the team to "move in."

¶ 22    As Pesce and his partner drove toward the house, Pesce heard several shots, saw several bullets ricochet off the Volvo's windshield, and saw Ramos fleeing on foot. Schillinger and Ford, who were in front of Pesce, exited their vehicle, announced their office, and told Ramos to drop

_____

[2] The record does not reveal Sergeant Pesce's first name.
[3] The record does not reveal Investigator Pitassi's first name.

his weapon. Schillinger then fired two shots and Ramos fell to the ground. Pesce and other officers placed Ramos into custody and recovered suspected narcotics from his person. The officers began a search for Ramos's gun, but the Illinois State Police arrived to conduct their own investigation and prevented Pesce's team from "properly search[ing]" for it. Once the Illinois State Police completed their investigation, Pesce's team moved the Volvo and found a gun under the driver's side tire.

¶ 23    On cross-examination, Pesce acknowledged that the gun was not recovered until "a number of hours" after he heard gunshots. In response to questions posed by the trial court, he stated that none of the Melrose Park police had dashboard cameras or body-worn cameras at the time of the incident and that the Volvo was "still moving" when the bullets were ricocheting off its windshield. On redirect, he clarified that the Volvo was "moving slowly as if it was rolling" and that, after Bartemio and Velazquez exited the Volvo, it continued rolling and hit two parked vehicles.

¶ 24    Melrose Park police sergeant Dennis Natale, another member of the surveillance team, testified that around 6 p.m., he saw Ramos, whom he had seen before and whom he identified in court, exit a black car and enter the house.[4] Shortly thereafter, Ramos exited the house and began walking back toward the black car. As Bartemio and Velazquez drove toward Ramos in a "controlled" manner, Ramos pulled out a gun and fired at their car. Natale drove as close as he could and then exited his car and ran to the area. He could not see whether any officer was firing back at Ramos.

¶ 25    When Natale arrived at the scene, Ramos was on the ground with several officers around him. The black car had driven away but, eventually, it was located, and Natale interviewed its

_____

[4] The record does not reveal Sergeant Natale's first name.

driver, Ivosaul Navarro. According to Navarro, he was not working for a ride share company on the day he was driving Ramos.

¶ 26    Melrose Park police detective Scarpelli, who was medically certified as an emergency medical technician, testified that he was working as a patrol officer in a marked squad car on the day in question.[5] Around 6:50 p.m., he responded to the scene after receiving a dispatch report of shots fired and an officer down. He attended to Ramos, whom he identified in court, as he was bleeding from a wound to his shoulder. During a rapid pat-down, Scarpelli recovered a "wad" of money from Ramos's back pocket. He then moved Ramos to an ambulance. There, he and paramedics cut off Ramos's clothing, exposing three bags of suspected cocaine, which Scarpelli recovered. Leaving Ramos in the care of the paramedics, Scarpelli returned to the scene. He remained there until the Illinois State Police completed their investigation and was present when a firearm was discovered underneath the Volvo's tire.

¶ 27    On cross-examination, Scarpelli stated that the Volvo could not be moved until the Illinois State Police were done processing the scene. In response to further questioning by the court, he explained that the weapon was not visible until the Volvo was moved.

¶ 28    Tenisha Jones, a crime scene investigator with the Illinois State Police, testified that she and her partner processed the scene. Among other things, her partner recovered two 9-millimeter cartridge casings. After Jones finished diagramming the scene, permission was given to move the Volvo. Moving the Volvo revealed a 9-millimeter handgun, which her partner recovered. Jones also testified that the five bullet holes in the Volvo's windshield were the result of gunshots fired from inside the vehicle, and that the only bullet hole "coming from outside of the car" was on its

---

[5] The record does not reveal Detective Scarpelli's first name.

hood. On cross-examination, Jones acknowledged that she did not arrive on the scene until over five hours after the shooting occurred.

¶ 29    Gregory Hickey, a forensic scientist with the Illinois State Police whom the parties stipulated was qualified as an expert in the area of forensic firearms and toolmarks analysis, testified that he tested two cartridge cases and a firearm recovered in the case. Based on his analysis, he concluded that the two recovered cartridge cases were fired by the recovered firearm.

¶ 30    Naemah Powell, a forensic scientist with the Illinois State Police whom the parties stipulated was an expert in drug chemistry analysis, testified that she tested the suspected narcotics. "Item 1," which consisted of three items, tested positive for 4.0 grams of cocaine. "Item 2," which consisted of one plastic bag, tested positive for 3.4 grams of cocaine.

¶ 31    The parties stipulated that Ramos did not have an Illinois Firearm Owner's Identification card or an Illinois Concealed Carry license on June 1, 2019.

¶ 32    Defense counsel made a motion for a directed finding, arguing that the State's evidence did not make sense where the gun was not found until hours after the shooting, its location was inconsistent with testimony that Ramos was holding the weapon as he fled, and no fingerprints or gunshot residue evidence tied Ramos to the recovered gun. Counsel further argued that issues existed regarding the chain of custody of the gun, the cartridge casings, and the drugs. Noting that the only bullet that hit the Volvo from the outside struck the hood, he also argued that Ramos was not trying to shoot at anyone but, rather, was acting in self-defense and "trying to get the person who was trying to hurt him to stop."

¶ 33    After hearing argument from the State, the trial court denied the motion for a directed finding.

¶ 34    For the defense, Ivosaul Navarro, who worked as a driver for Uber and Lyft, testified that he first met Ramos at a party five months before the date in question. They exchanged numbers and, over the next several months, Navarro drove Ramos six or seven times "[n]ot off the app but personally." On June 1, 2019, he was driving Ramos to a restaurant when Ramos said he had forgotten his wallet and needed to stop at his home. Navarro turned around and drove Ramos back to his house, arriving shortly before 7 p.m. Ramos entered the house and Navarro parked nearby and waited for him.

¶ 35    A few minutes later, Ramos exited the house. Navarro drove up to the house and parked sideways so that Ramos could enter the back seat. A Volvo SUV "came out of nowhere," "flying pretty fast" next to the side of his vehicle. Navarro thought the Volvo was "almost" going to hit him. The Volvo failed to stop at a stop sign and moved recklessly straight at Ramos and Navarro thought Ramos would be run over. Ramos pulled out a gun, shot at the Volvo, and ran away from it. At that point, someone jumped out of the Volvo and Navarro could see that he was wearing a police vest "from the back." Prior to seeing the vest, Navarro did not know that the Volvo was a police vehicle.

¶ 36    On cross-examination, Navarro clarified that when he drove Ramos on the day in question, he was not working for Uber or Lyft. He could not see what color gun Ramos was shooting; rather, he saw Ramos take something from his waistband, heard shots, and saw a "flash" coming from his hands. According to Navarro, Ramos "put his foot on the bumper and kicked back as he shot." In total, Ramos fired three shots. When the shooting started, Navarro "took off." He did not see Ramos drop anything or know what happened to Ramos's gun.

¶ 37    Defense counsel indicated that the defense would be resting. The trial court admonished Ramos regarding his right to testify and asked him whether he wished to testify in his own defense. Ramos answered that he did not. When the court asked whether he had come to that conclusion on his own and whether anyone had forced or threatened him or promised him anything to induce him to make that decision, Ramos answered "no." The court followed up, asking, "You made that decision of your own free will, is that right?" Ramos responded, "Yes, your Honor."

¶ 38    The State waived its opening closing argument. In closing, defense counsel argued that the various officers who testified were not credible and pointed out inconsistencies and discrepancies in their testimony. He expressed doubt that Bartemio would have been driving in a "controlled" manner with no sense of urgency in the circumstances. In contrast, he argued that Navarro, a disinterested witness, was credible, and highlighted his testimony that the Volvo was speeding and driving recklessly. When counsel asserted that Ramos lived in "survival mode" because he had "been associated with gangs since he's been 12 years old," the State objected. The trial court sustained the objection, stating, "There was no evidence to that effect. You may have thought there was going to be evidence to that effect, but there is not."

¶ 39    Counsel argued that the evidence showed a person coming out of his home, seeing an unmarked vehicle with tinted windows driving directly toward him at a high rate of speed, and reacting in self-defense. He stated, "[A]m I happy that my client had a gun, no. Am I happy that my client may have shot that gun, no. *** Would you or I possibly [have] shot at that? No. But we didn't grow up how William Ramos grew up." Later in his argument, counsel reiterated part of that argument, stating, "I repeat, am I happy that my client sometimes carries a gun? No. Am I happy those guns go off? No."

¶ 40    Counsel also asserted that nothing showed Ramos knew the people in the Volvo were police officers. He argued that Ramos had no intent to shoot at a police officer, as he did not know the Volvo's occupants were the police, and that he had no intent "to shoot at anyone to hurt them because all he was trying to do, Judge, was to stop a car that was coming towards him." Similarly, he argued that "there's two shots. If he wanted to kill someone, he would have emptied the gun. He wouldn't have shot two out of ten bullets."

¶ 41    Counsel noted that the recovered gun was not discovered until about six hours after the shooting and that, when it was found, it was located under one of the Volvo's tires. Counsel questioned how the gun arrived there, expressed doubt about the chain of custody of the gun and the drugs, and asserted that the police had engaged in "sloppy police work." When counsel professed that the court would have to find that the recovered gun was the one that Ramos had possessed, the court asked him why such a finding would be necessary where multiple witnesses, including Navarro, testified that Ramos possessed a gun and fired it at the Volvo. Counsel answered, "We could agree to disagree. I think you need the gun."

¶ 42    Concluding his remarks, counsel reiterated his self-defense argument, asserting that Ramos was justified in "[s]topping a vehicle" to protect his life. Counsel finished by arguing that inconsistencies existed in the police testimony, that the officers' conduct "went far greater than sloppy police work," and that the State had not proved its case beyond a reasonable doubt.

¶ 43    In rebuttal, the State asked the court to find Ramos guilty on all counts. Among other things, the State argued that the evidence showed Ramos possessed drugs, possessed and discharged a gun, and knew who he was shooting at, as he made eye contact with Bartemio and

Velazquez. In addition, the State questioned Navarro's credibility and asserted the officers had testified truthfully and honestly.

¶ 44    The trial court found Ramos guilty of armed violence (count VII), aggravated discharge of a firearm toward an occupied vehicle (counts XIV and XV), AUUW (counts XVI through XVIII), and possession of a controlled substance (count XIX). It found Ramos not guilty of attempted first degree murder of a peace officer (counts I through VI) and aggravated discharge of a firearm toward a peace officer (counts VIII through XIII). The court explained that the evidence did not show Ramos knew Bartemio and Velazquez were police when he fired his weapon, as there were "no uniforms, no announcement, no anything that would give anybody reason to believe, other than that eye contact that may or may not have existed, that [they] were the police and that he knew [they] were police." As to the guilty findings, the court stated, "I'm discounting your self-defense."

¶ 45    Defense counsel filed a motion to reconsider or, in the alternative, for a new trial. Counsel argued that the trial court had failed to sufficiently consider the affirmative defense of self-defense with respect to the charges of armed violence and aggravated discharge of a firearm toward an occupied vehicle. Counsel also challenged the chain of custody of the cocaine and the gun. Finally, counsel argued that the court erred in granting the State's motion *in limine* preventing any officer from testifying to a statement made by Ramos that would support self-defense, specifically, that, upon arrest, Ramos "made statements concerning 'people out there were looking to kill and hurt me, and I didn't know y'all were the police.' "

¶ 46    At the hearing on the motion, defense counsel conceded that Ramos possessed a weapon and, therefore, explained that his motion challenged the guilty findings for aggravated discharge of a firearm toward an occupied vehicle and possession of a controlled substance. In the course of

arguing that Ramos was acting in self-defense when he shot at the Volvo, counsel urged the court, *inter alia*, to consider what was going on in the mind of Ramos, "who's been in a gang since he's been 12 years old." The court responded that counsel should confine his argument to facts in the record, and that the length of Ramos's gang membership was not part of the record.

¶ 47 Following further argument from defense counsel and the State, the trial court denied Ramos's motion. The court rejected Ramos's challenge to the chain of custody, found that Ramos's statements to the police were not excited utterances, and found that Ramos did not act in self-defense when he fired at the Volvo. The court explained, "If he were acting in self-defense, by belief would have been it was an unreasonable belief that his life was in danger."

¶ 48 The court subsequently sentenced Ramos to a term of 15 years in prison for armed violence (count VII) and two concurrent terms of 9 years in prison for aggravated discharge of a firearm toward an occupied vehicle (counts XIV and XV). The court merged the remaining counts (counts XVI through XIX) into the armed violence count. Ramos filed a notice of appeal on the day of sentencing.

¶ 49 On appeal, Ramos contends that he received ineffective assistance of trial counsel where counsel (1) failed to support the theory of self-defense with evidence of his history of gang membership and (2) argued two competing theories of defense, one of which undermined the other. He asserts that the only theory of defense consistent with the evidence was that he acted in self-defense, that his history of gang membership was critical to this theory, and that counsel acted unreasonably in failing to elicit evidence of his gang membership during trial. Ramos further asserts that counsel acted unreasonably by refusing to admit in closing arguments that he possessed the recovered gun, let alone that he fired it in self-defense, and by arguing that he could not be

found guilty if the State did not provide the gun he had used. Ramos maintains that, had the court heard a consistent theory, supported by evidence, that he fired at the Volvo because he thought it was driven by a rival gang member trying to kill him, there is a reasonable probability that he would have been found not guilty of aggravated discharge of a firearm toward an occupied vehicle.

¶ 50    Every defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const.1970, art. I, § 8. Claims of ineffectiveness are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984). To establish a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. More specifically, a defendant must demonstrate that his counsel's performance was objectively unreasonable under prevailing professional norms (*id.* at 694), overcome a "strong presumption" that counsel's alleged error was part of a "sound trial strategy" (*People v. Houston*, 226 Ill. 2d 135, 144 (2007)), and establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland*, 466 U.S. at 694).

¶ 51    In reviewing claims of ineffective assistance of counsel, appellate courts "use a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim." *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). In this case, where Ramos is not challenging any findings of fact made by the trial court but, rather, is claiming that the trial court should have been presented with certain

evidence and arguments, we consider *de novo* whether Ramos has stated a claim for ineffective assistance of counsel. *People v. Ortega*, 2020 IL App (1st) 162516, ¶ 24.

¶ 52    We begin with Ramos's contention that trial counsel was ineffective for failing to support a theory of self-defense with evidence of his history of gang membership. Noting that counsel repeatedly attempted to argue that Ramos had been in a gang from a young age and lived in a gang-infested neighborhood, Ramos asserts that counsel was ineffective for failing to present such evidence at trial. He maintains that his history of gang involvement was crucial to explain why he believed the Volvo's driver was trying to harm him and to provide context for why he shot at the Volvo. He argues that counsel's repeated references to gang membership reflected counsel's belief that it was important to his defense and, as a result, it was objectively unreasonable for counsel to fail to elicit evidence of such membership at trial.

¶ 53    Based on the record before us, we reject Ramos's argument. Prior to trial, defense counsel told the court that Ramos was "planning on testifying" and that the court would "certainly here [*sic*] *** from him when he testifies." Then, in opening statements, counsel previewed testimony regarding Ramos's state of mind. He stated that because Ramos had been associated with gangs since he was 12 years old, he lived his life in "survival mode" and in constant fear of someone trying to hurt him. He argued, "Every morning waking up, he doesn't know if someone from another gang, from his gang, is going to be looking to hurt him, looking to kill him."

¶ 54    However, when it came time to present the defense case at trial, Ramos indicated he was electing not to testify. The trial court confirmed with him that he came to that conclusion on his own and that no one had forced him, threatened him, or promised him anything to make that

decision. When the court asked Ramos whether he made the decision not to testify of his own free will, he answered, "Yes, your Honor."

¶ 55    Given these circumstances, we find *People v. Manning*, 334 Ill. App. 3d 882 (2002), informative. In opening arguments in *Manning*, defense counsel stated that the defendant, who was charged with child abduction, would testify that he took his daughter to another state because he was concerned his wife was mistreating her. *Id.* at 884, 892. However, at trial, the defense provided no evidence of any mistreatment and the defendant informed the court he did not wish to testify. *Id.* at 884.

¶ 56    On appeal, the defendant contended that his trial counsel was ineffective for not delivering promised testimony. *Id.* at 886. This court noted that an attorney's failure to provide promised testimony is not *per se* ineffective assistance of counsel. *Id.* at 892. Rather, we explained, a defendant must show that counsel's decisions were unreasonable and that there was a reasonable probability counsel's errors affected the outcome of the proceedings. *Id.* (citing *Strickland*, 466 U.S. at 694).

¶ 57    This court observed that the defendant was not alleging that his attorney advised him not to testify, or that counsel made his opening remark without first asking the defendant whether he wished to testify. *Id.* at 893. We noted that the defendant could have informed his attorney prior to trial that he wished to testify and subsequently changed his mind, in which case, the failure to present the defendant's testimony would not have been due to counsel's incompetence. *Id.* Based on the record presented, we could not determine whether defense counsel's decision to abandon the defense of necessity was due to the defendant's choice not to testify, sound trial strategy, or

incompetence. *Id.* Accordingly, we were required to presume it was the result of trial strategy and we rejected the claim of ineffectiveness. *Id.*

¶ 58    In this case, Ramos is not explicitly asserting that counsel should have called him as a witness. Nevertheless, because such an argument is implied, his case is similar to *Manning*. As in *Manning*, we cannot determine from the record whether counsel's failure to call Ramos as a witness was due to Ramos's choice to exercise his right not to testify, sound trial strategy, or incompetence. In his reply brief, Ramos suggests that, as an alternative to testifying himself, counsel could have established his gang membership during cross examination of the various police officers who had known him for years, or by calling as defense witnesses his friends, family members, or other gang members. However, if counsel believed Ramos would be testifying, he would have had no reason to engage in such cross-examination or to call such witnesses. The record does not reveal when counsel became aware that Ramos was not going to take the stand in his own defense.

¶ 59    Ramos's contention presents matters outside the record that cannot be addressed on direct appeal. See *id.* at 894. Therefore, as this juncture, we must presume counsel's conduct was the result of trial strategy. See *id.* at 893. Ramos's claim of ineffectiveness fails on the performance prong of the *Strickland* test and, as such, we need not address the prejudice prong. See *Strickland*, 466 U.S. at 697 (a reviewing court need not address both prongs of the inquiry if the defendant makes an insufficient showing as to one prong).

¶ 60    Ramos next contends that counsel was ineffective in arguing two competing theories of defense, the second of which undermined the only defense consistent with the evidence, *i.e.*, self-defense. Noting that a defendant cannot claim self-defense without admitting he committed the

charged act, Ramos asserts that "contrary to a theory of self defense," counsel argued that the court had to find that the recovered gun was the one Ramos possessed in order to be found guilty. Ramos asserts that not only was counsel "flatly wrong," but he then "contradicted any notion that the State failed to prove that [he] possessed a gun when he admitted Ramos had a gun" and then "did not make the argument that Ramos shot the gun in self defense," stating, instead, that Ramos "may have shot that gun." Ramos maintains that counsel's failure to articulate the theory of self-defense constituted objectively unreasonable performance by prevailing professional norms.

¶ 61    It is well-settled that the choice of defense theory is a strategic decision to which we show great deference. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 33. "There are countless ways to provide effective assistance in any given case," so a defendant who claims that counsel's strategic decisions amounted to ineffective assistance must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Counsel's conduct, moreover, must be viewed "from counsel's perspective at the time," without "the distorting effects of hindsight." *Id.*

¶ 62    Going into trial, Ramos was facing three principal charges: attempted murder of a peace officer, aggravated discharge of a firearm in the direction of a vehicle occupied by a peace officer, and armed violence. All three are Class X felonies. On the first two charges, counsel took a multi-pronged approach. In addition to contending that Ramos was acting in self-defense, counsel also emphasized that the evidence did not show that Ramos knew that the unmarked cars speeding toward him were occupied by police officers or that he intended to kill anybody when he fired. A failure to prove an intent to kill would defeat the attempted-murder charge entirely, while a failure to prove Ramos's knowledge of who was in the car would reduce the aggravated discharge to a

Class 1 felony. See 720 ILCS 5/24-1.2(b) (West 2018). Those arguments, however, would have had no impact on the armed-violence charge, which was based on his alleged simultaneous possession of a gun and cocaine. Further, the indictment specifically alleged that the gun was a handgun, a fact that, if proven, would require a minimum sentence of 15 years as opposed to only 10 years. See 720 ILCS 5/33A-1(c)(2), 33A-3(a), (a-5) (West 2018). So, it made sense for counsel to also try for a finding that the State failed to carry its burden as to the gun.

¶ 63     Ramos argues that counsel's theory that the State had not met its burden of proving that he possessed a gun was "illogical" because it was inconsistent with self-defense and, therefore, resulted in a "failure to articulate [the] theory of self-defense." However, it is not improper for the defense to argue alternative theories, even ones that contradict each other. See, *e.g.*, *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 43 (citing *People v. Everette*, 141 Ill. 2d 147, 155-56 (1990)). Advancing conflicting theories during closing argument can be a dangerous tactic, especially before juries, who might view such arguments as implicit concessions or an indication that the defense is not principled. *Id.* But judges, unlike juries, are legal professionals, so they are much more likely to "take it in stride" when alternative theories are presented at a bench trial. See *id.*

¶ 64     The record shows that challenging the sufficiency of the evidence of the gun did not prevent counsel from presenting the self-defense theory during opening statement, trial, and closing argument. He advanced the theory through cross-examination of the various officers regarding the lack of police markings on the Volvo, the speed and manner in which the Volvo approached Ramos, the officers' failure to announce their office as they approached, and Ramos's "paranoid" demeanor when he exited the house. Counsel further developed the theory through the testimony

of Navarro, who stated that the Volvo failed to stop at a stop sign and was "flying pretty fast" so that he thought it was going to run over Ramos. In closing, counsel maintained that Navarro was the only credible witness and presented Navarro's version of events in arguing that Ramos, seeing an unmarked vehicle with tinted windows driving directly toward him at a high rate of speed, reacted in self-defense. It also appears from the record that the court—which addressed the inconsistency directly—had no difficulty understanding that theory.

¶ 65     We are mindful of Ramos's assertion that counsel "did not make the argument that Ramos shot the gun in self defense" but, rather, argued only that Ramos "may have shot that gun." While this is a precise recounting of one portion of counsel's closing argument, it is not an accurate portrayal of counsel's overall presentation of the theory of self-defense. In opening statements, when previewing the evidence, counsel stated, "My client reaches in his waistband, pulls out a gun, shoots twice at the Volvo." Then, when arguing for a directed finding, counsel noted that only one bullet hit the Volvo's hood and stated, "[E]ither [Ramos] is one lousy shot or he was not trying to shoot at anyone, he was trying to get the person who was trying to hurt him to stop trying to hurt him." Finally, during closing argument, counsel stated that Ramos had no premeditated intent "to shoot at a police officer that he didn't know was a police officer," had no intent "to shoot at anyone to hurt them because all he was trying to do *** was to stop a car that was coming towards him," and, had "he wanted to kill someone, he would have emptied the gun" rather than firing only two shots." In short, counsel did present a theory that Ramos shot at the Volvo in self-defense.

¶ 66     Under the circumstances of the case as disclosed by the record, we are unable to say that counsel's strategy of advancing alternative theories was objectively unreasonable. Because Ramos has not overcome the presumption that counsel's choice of strategy was the product of sound

professional judgment, we need not address the prejudice prong of the *Strickland* test with regard to counsel's choice of defense theory. See *Strickland*, 466 U.S. at 697 (a reviewing court need not address both prongs of the inquiry if the defendant makes an insufficient showing as to one prong).

¶ 67    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 68    Affirmed.